Tina Louise **MIRANDA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04-89-00298-CR.

Court of Appeals of Texas,
San Antonio.

July 24, 1991.

Discretionary Review Refused
Oct. 30, 1991.

Jack Paul Leon, Law Offices of Jack Paul Leon, San Antonio, Benjamin F. Walker, San Antonio, Tex., for appellant.

Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Before PEEPLES, BIERY and ONION,[1] JJ.

---

## OPINION

ONION, Justice (Assigned).

Appellant, Tina Miranda, appeals her conviction for the murder of her husband, Andrew Miranda. After finding appellant guilty, the jury assessed punishment at twenty-five years' imprisonment and a fine of ten thousand dollars.

Appellant advances eleven points of error. Among these points are the contentions that the trial court erred in (1) overruling the motion for an instructed verdict; (2) charging the jury on the law of parties; (3) permitting the State to impeach its own witness, Melissa Lucio, with a prior inconsistent written statement as well as oral statement; (4) permitting the introduction of the written instrument itself after the witness admitted making the statements contained therein; (5) permitting the impeachment of Melissa Lucio by the testimony of her husband; (6) overruling objections to the prosecutor's improper jury argument asking the jury to consider impeachment evidence relating to Melissa Lucio as evidence of appellant's guilt; (7) overruling objections to the prosecutor's improper jury argument asking the jury to consider impeachment evidence relating to the State's witness, Anselmo Martinez, as evidence of appellant's guilt; and (8) permitting the introduction into evidence of the results of a paternity test showing that appellant's husband was not the father of her child. We will affirm the judgment of conviction.

In her initial contention appellant urges that the trial court erred in overruling her motion for an instructed verdict of "not guilty." The State argues that the point is not preserved for review as appellant offered defensive evidence after the overruling of said motion. *See Kuykendall v. State,* 609 S.W.2d 791, 794 (Tex.Crim.App. 1980). In light of *Madden v. State,* 799 S.W.2d 683, 686 n. 3 (Tex.Crim.App.1990), we shall consider the contention as a sufficiency of the evidence question. Our dis-

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

cussion shall include points of error two and three, which argue that the trial court erred in submitting the case to the jury on the theory of the law of parties because there is no evidence that appellant solicited, encouraged, directed, aided, or attempted to aid any other person to commit the murder of Andrew Miranda, and that the evidence is insufficient to support the jury's finding to that effect.

Andrew Miranda served in the United States Marine Corps. When he came home to San Antonio from California in 1983, appellant, then Tina Wilkins, came with him. She later returned to California. During a late November 1984 visit to San Antonio by appellant, Susan Rodriguez, Andrew's foster mother, observed appellant taking what appeared to be morning sickness pills. Appellant later telephoned Andrew from California around Christmas 1984 to discuss her pregnancy. The couple married June 5, 1985, and on June 25, 1985, appellant gave birth to Andria Miranda.

Sometime in the late spring of 1986 the Miranda marriage began to experience some difficulties. Andrew moved in with a postal service co-worker, Mario Hernandez, on June 15, 1986, and later moved in with his foster mother, sometime in July 1986. A divorce petition was filed by Andrew.

Shirley Ann Martinez, another postal service co-worker of Andrew's, godmother of the child and her babysitter, testified that she had a conversation with appellant after the separation; that appellant told her that Andrew wanted a divorce and wanted a blood test to determine if the child was his; and that appellant did not want to have such paternity test.

Martinez also recalled that appellant expressed a wish that her husband would be killed. Martinez stated that appellant was upset because she had seen Andrew with someone else, and that appellant "sat there and she just said she wished she could be real strong so that she could be very nice to Andrew and get him to come to her apartment, and then she'd kill him...." Martinez then revealed that appellant made a gesture or motion from one side of her neck to the other. Martinez thought appellant was serious and she was "scared" by appellant's remarks.

On September 10, 1986, less than four days before the alleged offense, appellant and the child gave blood specimens for the paternity test. Andrew had given one earlier. The technician at the laboratory told appellant the results of the test would be available within approximately fifteen days. The results received after Andrew's death concluded that he could not have been the father of the child.

On September 12, 1986, there was evidence that Andrew received a telephone call from his attorney concerning a settlement in a personal injury case which had been filed some two months before Andrew separated from appellant. Twenty or thirty minutes later Andrew received a telephone call from appellant. He was heard to ask her how she "found out." He then promised to give her $10,000 "after the settlement," and stated that he did not want to argue with her.

Andrew left work early on the evening of September 13, 1986, about 10:45 p.m. He did not complete his shift. A co-worker testified that Andrew received a telephone call before leaving the postal service unit where he was employed. Andrew later left a note for his foster mother at her home declaring his intentions to return there.

Shortly after time edged past midnight and into September 14, 1986, Andrew stumbled into the El Caribe Bar and collapsed on the dance floor. He was covered with blood. Anselmo Martinez, the owner of the bar, asked in Spanish: "Who wounded you?" Andrew responded in English: "My wife, brother-in-law and cousin." A trail of blood led to the nearby duplex at 652 Funston where appellant lived. Andrew died a short time later.

The cause of death was shown to be massive bleeding resulting from eight stab wounds to the face, neck, chest, and back of the deceased. The wounds were inflicted by two knives. Some of the wounds were consistent with the type of knife later found in the kitchen sink of appellant's duplex. The medical examiner found no defensive wounds or wounds which would

indicate that the deceased had been in a fist fight.

Clementina Garcia lived in the duplex above that of appellant. When Garcia returned home about 11:15 p.m. on September 13, 1986, she observed James Wilkins, appellant's brother, seated in the living room of appellant's duplex. Around midnight Garcia heard noises, sounding like furniture being thrown, in the duplex below. It sounded like two people fighting. Garcia then saw Andrew Miranda exit through the kitchen door below, stumble, and head toward the door of the nearby El Caribe Bar. Garcia then saw James Wilkins leave the duplex below and get into the driver's side of appellant's car and tell another person, "Get in, get in." She heard both car doors "shut," but she did not see who got into the passenger side of the car. The car drove off in the opposite direction of the El Caribe Bar.

Garcia then saw appellant exit through the kitchen door and heard her cry, "Help," and call out the names of Garcia's brothers. Garcia and one of her brothers went downstairs. The emotional appellant told them that a "Mexican guy" had been fighting with her husband and that her brother had tried to assist her husband. Appellant showed Garcia the blood in various parts of the small duplex. Appellant made no inquiry about the deceased.

San Antonio police officer Lacy followed the trail of blood from the bar into appellant's duplex. He heard appellant talking "softly" and "calmly" on the telephone. When Lacy's police radio broadcast a dispatcher's acknowledgement appellant began crying and screaming. She agreed to go to the police station.

Jerry Russell, the father of James Wilkins, appellant's brother, testified that Wilkins had stayed at his house on September 11 and 12, 1986, and appellant's cousin, Steve Sparkman, had stayed with him on the same dates. Russell revealed that on September 13, 1986, Wilkins and Sparkman left his house in appellant's car. He never saw Sparkman again. Wilkins returned to the Russell house about 2:30 or 3:00 a.m. on September 14, 1986. Southwest Airlines

records showed that an individual named "S. Sparkman" was a passenger on a 9:00 a.m. flight on September 15, 1986, from San Antonio with the eventual destination of Ontario, California. Shirley Martinez recalled that about a week before the alleged offense appellant had asked her to babysit because appellant had to pick up her cousin, Steve, from California at the airport.

Appellant arrived at the police station at about 2:00 a.m. on September 14, 1986, and gave a written statement. She told the police that her husband had called and asked her to go out with him; that her brother was present and agreed to babysit; that she was in the bathroom when she heard Andrew yell for her to call for the police and for "Jimbo" Wilkins to help him; that she saw Andrew on the floor and heard her brother tell her to call the police and she did; that Andrew had blood on his face when he and her brother left the house; that her brother drove off in her car; and that she did not see what happened to her husband.

Appellant returned an hour later and told the police she had left "some things out" of her earlier statement. She gave a second statement admitting that she saw her brother and Andrew wrestling on the floor and that her brother had a brown colored knife handle in his hand, but she did not see any stabbing.

At 9:00 a.m. on September 14, 1986, appellant appeared at the home of Mario Hernandez, where Andrew stayed briefly after their separation. She wanted her husband's "insurance papers." Appellant did not seem to be upset until Hernandez rebuked her. Then, while crying, appellant told Hernandez that a kinky haired "Mexican guy from the post office was the one that killed Andy," who was stabbed in front of the house.

About 11:00 a.m. on the same date (a Sunday) appellant went to the Perrin–Beitel Post Office where the deceased had worked. She asked employees there if this was the office where you collect insurance money. She was told to go to the personnel office on Monday. She then told the

postal workers that her husband had died in the hallway and a suspect was in custody.

Appellant arrived at the personnel office at 8:00 a.m. on Monday, September 15, 1986, inquiring about how much money she would get if she were the sole beneficiary of the deceased's life insurance policy. She was told that she would receive approximately $130,000.00. Isabella Rodriguez, in the personnel office, never had a widow ask "how much money am I getting" type questions like appellant asked and that she did not appear to be the grieving widow. Rodriguez recalled that the deceased and appellant had been in her office the day after they married and that she had then explained that if no beneficiary were designated, the wife of the insured would get the insurance proceeds in the event of death. Appellant told Rodriguez that she had been in the bathroom when she heard fighting and yelling, and when she came out of the bathroom there was blood everywhere, but no one was in the house. Thereafter, appellant contacted Rodriguez weekly about the life insurance.

About 9:00 p.m. on September 15, 1986, appellant returned to the same post office, apparently to find pallbearers for her husband's funeral. While there, she told conflicting stories to the employees about what had occurred. To one employee, she related that she saw the deceased lying in the hallway before he ran out of the house. To another, she revealed that the deceased was attacked outside the house, and that someone was chasing him. At a Rosary for the deceased, she gave different versions to different individuals.

Shirley Ann Martinez was asked to take care of the child shortly after the alleged offense. Appellant told her then that the deceased ran from the house and Wilkins ran after the deceased to help him. After the funeral, appellant gave a different account of the events to Martinez. She told Martinez that she had seen her brother, with a brown handle of a knife in his hand, running after the deceased and that her brother had gone to talk to the detectives and had assured her that "he would take

the rap for it." Later, Martinez gave a written statement to Detective Mena on September 26, 1986. Appellant learned of the statement from her attorney and asked Martinez to go to her attorney's office to explain why she had given the statement. Martinez went to the attorney's office but did not give another statement. Martinez explained that she was not accusing appellant. Martinez further revealed that she was in the process of buying a home, and that appellant offered to buy the home for her using the deceased's life insurance proceeds. Martinez refused the offer. Their friendship ended when appellant learned that Martinez was going to testify.

Richard Lucio testified that he had occasion to tell appellant that his wife, Melissa, had given a statement, after the alleged offense, to the police about an earlier conversation she had with appellant; that appellant made an appointment with her attorney and took them to the attorney's office; that his wife gave the attorney a written statement recanting the one given to the police and that appellant then took them to lunch; and that appellant offered to give or loan him money for a monthly car payment which he did not accept. Lucio stated that he considered that appellant was trying to bribe him.

■ The standard for reviewing the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Valdez v. State,* 776 S.W.2d 162, 165 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *Dickey v. State,* 693 S.W.2d 386, 387 (Tex.Crim.App.1984). The standard for review is the same in both direct and circumstantial evidence cases. *Chambers v. State,* 711 S.W.2d 240, 244–45 (Tex.Crim. App.1986).

■ A conviction based on circumstantial evidence, however, cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of

the defendant's guilt. *Butler v. State,* 769 S.W.2d 234, 238–39 (Tex.Crim.App.1989); *Humason v. State,* 728 S.W.2d 363, 366 (Tex.Crim.App.1987). If, after viewing the evidence in the light most favorable to the verdict, there is a reasonable hypothesis other than the guilt of the accused, then it cannot be said that guilt has been shown beyond a reasonable doubt. *Martin v. State,* 753 S.W.2d 384, 387 (Tex.Crim.App. 1988); *Anderson v. State,* 701 S.W.2d 868, 872 (Tex.Crim.App.1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986). In circumstantial evidence cases, it is not necessary that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating evidence. *Russell v. State,* 665 S.W.2d 771, 776 (Tex. Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). The rules of circumstantial evidence do not require that the circumstances should, to a moral certainty, actually exclude every hypothesis. The hypothesis intended is a reasonable one consistent with the circumstances and facts proved, one not out of harmony with the evidence. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App. 1977); *see also Russell,* 665 S.W.2d at 776; *Hooker v. State,* 621 S.W.2d 597, 601 (Tex. Crim.App.1980). Simply because a defendant presents a different version of the events does not render the evidence insufficient. *Little v. State,* 758 S.W.2d 551, 562–63 (Tex.Crim.App.), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988).

▮▮▮ The trial court in the instant case submitted the case to the jury on the sole theory that appellant was a party to the murder of Andrew Miranda.[2] *See* TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974). Under the statute and the court's charge, the State was required to prove conduct constituting the offense charged plus an act done by appellant with intent to promote or assist such conduct. *Beier v. State,* 687 S.W.2d 2, 4 (Tex.Crim.App.1985).

**2.** The trial court may charge the jury on the law of parties and apply the law to the facts even if there is no allegation in the indictment. *Williams v. State,* 676 S.W.2d 399, 401 (Tex.

The evidence is sufficient to convict a defendant under the law of parties when he or she is physically present at the commission of the offense and encourages the commission of the offense either by words or other agreement. *Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Navarro v. State,* 776 S.W.2d 710, 712 (Tex.App.—Corpus Christi 1989, pet. ref'd). The agreement, if any, must be before or contemporaneous with the criminal event. *Beier,* 687 S.W.2d at 3–4. In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, or after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to commit the offense. *Burdine,* 719 S.W.2d at 315; *Medellin v. State,* 617 S.W.2d 229, 231 (Tex.Crim.App. 1981).

▮▮▮ While an agreement of the parties to act together in common design seldom can be proved by direct evidence, reliance can be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act. *Ex parte Prior,* 540 S.W.2d 723, 727–28 (Tex. Crim.App.1976); *Bratcher v. State,* 771 S.W.2d 175, 183 (Tex.App.—San Antonio 1989, no pet.). Participation in a criminal offense may be inferred from the circumstances. *Beardsley v. State,* 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *Freeman v. State,* 654 S.W.2d 450, 454 (Tex.Crim.App. 1983). Circumstantial evidence alone can be sufficient to show that one is a party to the offense. *See Wygal v. State,* 555 S.W.2d 465, 469 (Tex.Crim.App.1977). Every circumstantial evidence case must be evaluated on its own facts, and will stand or fall on the cumulative effect of the evidence produced at trial. *See Alexander v. State,* 740 S.W.2d 749, 758 (Tex.Crim. App.1987).

Crim.App.1984); *Pitts v. State,* 569 S.W.2d 898, 900 (Tex.Crim.App.1978); *Bratcher v. State,* 771 S.W.2d 175, 183 (Tex.App.—San Antonio 1989, no pet.).

■ Proof of motive is admissible as a circumstance indicating guilt. *See Harris v. State*, 727 S.W.2d 537, 542 (Tex.Crim. App.1987). Motive evidence may include the fact that the defendant stood to become the recipient of some financial gain incident to the death of the victim. *See Swink v. State*, 617 S.W.2d 203, 208 (Tex.Crim.App.), *cert. denied*, 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981), *overruled on other grounds, sub nom., Griffin v. State*, 765 S.W.2d 422 (Tex.Crim.App.1989); *Brown v. State*, 475 S.W.2d 938, 943, 953–54 (Tex. Crim.App.1971), *overruled on other grounds*, 608 S.W.2d 918 (Tex.Crim.App. 1980). In the instant case appellant was aware that at the time she was the sole beneficiary of a substantial sum of insurance proceeds in the event of the death of her husband and that a divorce suit was pending with the results of a paternity test expected soon. She was also aware of a pending settlement of a personal injury suit in which she had a financial stake. Appellant apparently argued with the deceased about her share a day before the alleged offense. Her actions after her husband's death showed her concern and interest in obtaining the insurance proceeds.

■ Prior statements of the accused in a murder case threatening to kill the victim or evidencing an interest in the victim's death are a circumstance indicating guilt. *See Harris*, 727 S.W.2d at 542. Appellant told Shirley Martinez that she wished that Andrew was dead and that she wanted to lure him to her apartment so he could be killed.

■ Appellant was present at the scene of the alleged offense. While mere presence alone is not in and of itself sufficient to sustain a conviction, it is a factor which may be considered in conjunction with other factors in determining the sufficiency of the evidence to show that a defendant was a participant. *See Contreras v. State*, 745 S.W.2d 59, 61 (Tex.App.—San Antonio 1987, no pet.).

In addition, there was a dying declaration of the deceased that he had been wounded by his "wife, brother-in-law and cousin." This was clear evidence of appellant's participation and that the parties acted together. Appellant indicated, about a week before the alleged offense, that she was picking up her cousin from California at the airport. The cousin, Sparkman, and appellant's brother, Wilkins, were placed together at the Russell home. They were using appellant's car and left there in the car on September 13th. Wilkins and another person fled from the scene after the stabbing. Wilkins returned to the Russell home alone. Sparkman apparently left for California by air at 9:00 a.m. on September 14, 1986.

■ A trail of blood led from the bar where the deceased collapsed to appellant's duplex. A kitchen knife was found there. The deceased's wounds were apparently inflicted by two different knives. Some of the wounds were consistent with having been made by the kitchen knife found in appellant's duplex. A jury may derive the identity of a party's co-actors from the evidence adduced at trial. *See Galvan v. State*, 598 S.W.2d 624, 629 (Tex. Crim.App.1979); *Gordon v. State*, 714 S.W.2d 76, 77 (Tex.App.—San Antonio 1986, no pet.). Furthermore, appellant's actions after the commission of the alleged offense are also factors indicative of guilt. The making of contradictory or false statements concerning the facts have been held to be inculpatory evidence. *See Swink*, 617 S.W.2d at 208; *Vaughn v. State*, 607 S.W.2d 914, 920 (Tex.Crim.App.1980). Attempts to suppress or fabricate evidence are admissible against a defendant. *Johnson v. State*, 583 S.W.2d 399, 409 (Tex. Crim.App.1979); *Garza v. State*, 172 Tex. Crim. 468, 358 S.W.2d 622, 623 (1962). Appellant's actions encompassed both of these factors.

■ Jurors are the triers of the facts, the judges of the credibility of the witnesses, and the weight to be given to their testimony. TEX.CODE CRIM.PROC. ANN. art. 38.04 (Vernon 1979). The jury is entitled to accept or reject all or any part of the testimony by the witnesses for the State and the accused. *See Beardsley*, 738 S.W.2d at 684. Reconciliation of evidentiary conflicts is solely a function of the trier

of fact. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982).

In viewing the evidence in the light most favorable to the jury's verdict, we conclude that any rational trier of fact could have found beyond a reasonable doubt all of the essential elements of the offense charged, that appellant was a party to such offense, and that the evidence is sufficient to exclude all reasonable hypotheses except that of appellant's guilt. Appellant's first and third points of error are overruled. The fact that the evidence is sufficient is also dispositive of whether the jury charge on the law of parties should have been given. *Snow v. State*, 721 S.W.2d 943, 947 (Tex. App.—Houston [1st Dist.] 1986, no pet.); *see also Bratcher*, 771 S.W.2d at 183–84. The second point of error is overruled.

In her fourth and fifth points of error, appellant urges that the trial court erred in permitting the State to impeach its own witness, Melissa Pena Lucia, with a prior inconsistent written statement and with prior inconsistent oral statements (all to the effect that appellant had asked the witness if she knew of anyone who would be willing to kill appellant's husband) because the State, knowing that the witness had recanted the written statement and had declared the oral statements to be untrue, called the witness for the sole purpose of introducing prior hearsay statements into evidence before the jury under the guise of impeachment.

■ The voucher rule in Texas with its common law roots is gone with the wind. *Russeau v. State*, 785 S.W.2d 387, 390 (Tex.Crim.App.1990). "The credibility of a witness may be attacked by any party, including the party calling him." TEX. R.CRIM.EVID. 607. Thus, a party is not prohibited from impeaching his own witness. *Zule v. State*, 802 S.W.2d 28, 34

(Tex.App.—Corpus Christi 1990, pet. ref'd). It has been said that a party is permitted to impeach his own witness to the same extent that he would be permitted to impeach an adversary's witness. *See Bell v. State*, 768 S.W.2d 790, 803 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). The right to impeach one's own witness, however, is subject to the court's authority under Rule 403 and Rule 610 to protect against abuse. TEX.R.CRIM.EVID. 403, 610; 33 S. GOODE, O. WELLBORN & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 607.2, at 404 (1988) [hereinafter GOODE].

■ The former caselaw[3] imposed a predicate of "surprise" (including lack of foreknowledge) and the former statute[4] imposed a predicate of "injury to the cause" before a calling party could impeach its own witness. These strict requirements are no longer essential. *See Bell v. State*, 768 S.W.2d at 803 (as to the necessity of showing "surprise"); *Stills v. State*, 728 S.W.2d 422, 427–28 (Tex.App.—Eastland 1987, no pet.) (Rule 607 now eliminates both of the previous requirements); GOODE, § 607.2, at 404; 27 C. WRIGHT & V. GOLD, FEDERAL PRACTICE AND PROCEDURE § 6091, at 493 (1990) (Federal Rule 607 does not require that the impeaching party be surprised or damaged by the testimony).[5]

Since Rule 607 dispenses with the "surprise" and "injury" requirements as a prerequisite to the impeachment of a party's own witness, the opposing party will have to resort to Rule 403 as its ground for objection. GOODE, § 607.02 (Supp.1990).

The impeachment of one's own witness should be presumed proper under Rule 607. Surprise (including a party's foreknowledge that his witness will not testify favor-

---

**3.** *Goodman v. State*, 665 S.W.2d 788, 791 (Tex. Crim.App.1984); *Wall v. State*, 417 S.W.2d 59, 61 (Tex.Crim.App.1967); *see also Spence v. State*, 795 S.W.2d 743, 754 (Tex.Crim.App.1990).

**4.** Act of June 18, 1965, ch. 722, § 1, 1965 Tex. Gen.Laws 317, 470, *repealed by* Act of June 14, 1985, ch. 685, § 9(b)(2), 1985 Tex.Gen.Laws 2472, 2474. The statute was previously found at TEX.CODE CRIM.PROC.ANN. art. 38.28.

**5.** Federal Rule of Evidence 607 is identical with our Rule 607 except for the 1987 gender change amendment in the federal rule. We can look to the federal interpretation of Rule 607 as guidelines for the interpretation to be placed on our Rule 607. *See Campbell v. State*, 718 S.W.2d 712, 716–17 (Tex.Crim.App.1986).

ably) and the extent of injury are important factors in any Rule 403 balancing test, but are not per se requirements. GOODE, § 607.2, at 404. There has always been a danger that a party may attempt to use a prior inconsistent statement under the guise of impeachment for the primary purpose of placing before the jury evidence which is not otherwise admissible and which may be treated as substantial evidence. To prevent this was the purpose of the formerly required showing of surprise and damage or injury to the calling party's cause before such testimony was elicited. This is still improper conduct under both the federal and state versions of Rule 607, which are almost identical. *See Pruitt v. State,* 770 S.W.2d 909, 910 (Tex.App.—Fort Worth 1989, pet. ref'd); *see also United States v. Peterman,* 841 F.2d 1474, 1479 (10th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989); *United States v. Johnson,* 802 F.2d 1459, 1466 (D.C.Cir.1986); *United States v. Hogan,* 763 F.2d 697, 702 (5th Cir.1985), *modified on other grounds,* 771 F.2d 82 (5th Cir.1985), *aff'd in part, rev'd in part,* 779 F.2d 296 (5th Cir.1986). A Rule 403 balancing approach would require that "impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible." *Whitehurst v. Wright,* 592 F.2d 834, 839 (5th Cir.1979); *see also United States v. Johnson,* 802 F.2d at 1466.

■ A frequently used means of impeaching a witness is by proof of a prior inconsistent statement, oral or written, under oath or not. Traditionally, the prior statements of a witness are hearsay if offered to prove the truth of the matter asserted. Unless a witness's prior inconsistent statement falls within a hearsay exception it is admissible only for purposes of impeachment and not as substantive evidence.

Prior inconsistent statements that have been made under oath and subject to the penalty of perjury at a trial, hearing, other proceeding (except before a grand jury), or in a deposition, have now acquired a non-hearsay status. TEX.R.CRIM.EVID. 801(e)(1)(A). These statements may be used as substantive evidence as well as for impeachment purposes. However, other prior inconsistent statements commonly used for impeachment are still hearsay. Impeachment evidence is relevant under Rule 402 unless otherwise provided, *see* 27 C. WRIGHT & V. GOLD, FEDERAL PRACTICE & PROCEDURE § 6092, at 487 (1990), and Rule 607 permits the use of prior inconsistent statements that are hearsay for the purposes of impeachment. Courts, of course, must be careful to give jury instructions limiting the evidence to the issue of impeachment. *See Contreras v. State,* 766 S.W.2d 891, 892–93 (Tex. App.—San Antonio 1989, no pet.).

■ A party should not, however, be permitted to use a straw-man ploy to get impeachment evidence before the jury as substantive evidence. Courts should balance the probative value of admitting the prior inconsistent statement for its legitimate impeachment purpose against the danger of unfair prejudice created by the jury misusing the statement for substantive purposes. TEX.R.CRIM.EVID. 403.

■ With this background, we now examine appellant's fourth and fifth points of error. At the guilt/innocence stage of the 1986 trial, the State called Melissa Pena Lucio as a witness. She was eighteen years old at the time. After some background interrogation, the witness acknowledged that appellant was her friend. Melissa then denied that she had talked to appellant at the Folklife Festival in August 1986 about appellant's husband, the deceased. At this point a written statement was marked State's exhibit number 86 for identification. When the witness was asked if she had talked to appellant at the festival about murdering the deceased, the following objection was lodged:

MR. LEON [Defense Counsel]: Your Honor, we would object to that. First, the proper predicate has not been laid. This is his witness that he has called. She has already responded that there was never any discussion. It is highly improper and highly prejudicial and

we'd ask that this matter be developed outside the presence of the jury.

THE COURT: That objection is overruled.

After denying that she had any such conversation with appellant, the record reflects:

Q. Do you recall talking to a Detective Mena?

A. Yes.

MR. LEON: Now again, Your Honor, we don't think the proper predicate has been laid. He's called this witness to the witness stand. It's his witness. First, it's leading and it's leading [sic] and suggestive. Second, he's attempting to impeach the witness that he's called because he doesn't like the responses he is receiving. We object to it as being improper.

THE COURT: Well, that objection—the objection to *that* question is overruled.

(Emphasis supplied.)

Thereafter, the prosecutor continued to show when, where, and to whom State's exhibit number 86 was given as well as other related background. Melissa admitted that she voluntarily gave a sworn written statement to Detective Mena on September 23, 1986, when she was fifteen years old; that the statement was given in her parents' home; and that her parents, sister, and her boyfriend, now her husband, were present. During this interrogation appellant made two "hearsay" objections when she thought that the prosecutor was attempting to go into the contents of the statement. The objections were overruled. When the prosecution did so inquire, appellant objected that the witness was without counsel, that the contents of the statement were "hearsay," and that the evidence would be prejudicial and inflammatory. Appellant's counsel added that the witness was going to say she was "mad" at appellant when the statement was given. The record then reflects:

MS. ALBIN: We don't know what she's going to say.

MR. LEON: Well, I don't know either....

The objections were overruled.

Thereafter, Melissa acknowledged that in the written statement she had stated that appellant told her that if she (Melissa) could get someone to kill the deceased, appellant would get her a Fiero, her dream car. Melissa told the prosecutor that she had no such conversation with appellant; that the written statement was not the truth; that she gave the statement because she was angry with appellant because appellant had told her parents that she (Melissa) was pregnant; that she was pregnant but did not know it at the time; and that she later married her boyfriend. Melissa could not remember a district attorney's investigator, Joe O'Brien, coming to her high school in 1986 inquiring whether State's exhibit number 86 was true and correct. She revealed that she told her mother the truth was not in the written statement, and that later she, her husband, and her mother went to the office of appellant's defense counsel. A written sworn statement and two letters were then marked for identification as State's exhibits numbers 87, 88, and 89. Melissa identified State's exhibit number 87 as the written statement she had given on March 11, 1987, to defense counsel, retracting her statement made to Detective Mena. State's exhibits numbers 88 and 89 were identified as letters written in the defense counsel's office on January 26 and May 24, 1988, respectively, and later delivered to the district attorney's office with an attached copy of State's exhibit number 87.

The prosecutor then revisited State's exhibit number 86 with the witness. Appellant's "running objection to the whole statement" was granted, and her "hearsay" and "the statement has been declared false" objections were overruled. Thereafter, the prosecutor elicited from Melissa that in State's exhibit number 86 she had stated that appellant told her that she (appellant) needed money, was looking for someone to kill her husband, and had told her to ask her (Melissa's) boyfriend "to see what he would say."

On cross-examination, Melissa told appellant's counsel that State's exhibit number 86 was a "lie," and that she came to his office and voluntarily gave State's exhibit number 87, repudiating the earlier given State's exhibit number 86. Appellant then introduced State's exhibit number 87 and had Melissa verify the contents as the exhibit was read to the jury. Appellant also introduced State's exhibits numbers 88 and 89, letters of January 26 and May 24, 1988, prepared in defense counsel's office to prevent Melissa's husband from being harassed at his place of employment. Appellant had Melissa read to the jury the two letters addressed to the district attorney's office. On re-direct examination the State introduced into evidence State's exhibit number 86, the written instrument itself.[6] The trial court subsequently gave a limiting charge on State's exhibit number 86 in its jury instructions.

In response to appellant's contentions, we first observe that the complaints on appeal (that the State called the witness solely to impeach her, and to get inadmissible hearsay before the jury under the guise of impeachment) do not comport with the objection or objections made at trial. Under these circumstances, nothing is preserved for review. *Johnson v. State*, 803 S.W.2d 272, 292 (Tex.Crim.App.1990); *Pyles v. State*, 755 S.W.2d 98, 122 (Tex. Crim.App.1988), *cert. denied*, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988); *Paster v. State*, 701 S.W.2d 843, 846 (Tex.Crim. App.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *see also Burdine v. State*, 719 S.W.2d at 319. It is for this reason that we have reviewed at some length the interrogation of Melissa Lucio.

For an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for the objection. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Crim.App.1990); TEX. R.APP.P. 52(a); TEX.R.CRIM.EVID. 103(a). A general objection normally presents nothing for review on appeal. *Williams v. State*, 596 S.W.2d 862, 866

(Tex.Crim.App.1980); *Gonzales v. State*, 775 S.W.2d 776, 779 (Tex.App.—San Antonio 1989, pet. ref'd). Appellant did object that the State was impeaching its own witness. Under Rule 607 the right to impeach one's own witness is presumed. Appellant objected early on that a proper predicate had not been laid. That has been held to be a general objection which does not preserve error. *Smith v. State*, 683 S.W.2d 393, 403-04 (Tex.Crim.App.1984); *Williams*, 596 S.W.2d at 866. Furthermore, surprise and injury to the calling party's cause are no longer a required predicate for the impeachment of one's own witness under Rule 607. Nevertheless, even these matters were not mentioned in the objections. Appellant's general objections on the basis of "hearsay" preserved nothing for review. *See Lewis v. State*, 664 S.W.2d 345, 349 (Tex.Crim.App.1984); *Martinez v. State*, 732 S.W.2d 401, 401, 403 (Tex.App.—Houston [14th Dist.] 1987, no pet.). Appellant's running objection appears to be based on the previous "hearsay" objection and under the circumstances was insufficient to preserve error. *See Mares v. State*, 758 S.W.2d 932, 933 (Tex. App.—El Paso 1988, pet. ref'd). As earlier observed, prior inconsistent statements of a witness, even though hearsay, may be used for the purpose of impeachment. Appellant urges that her running objection was permitted by the court and when made late in the interrogation covered all her objections to the statement. She cites *Sattiewhite v. State*, 786 S.W.2d 271, 283-84 (Tex. Crim.App.1989), *cert. denied*, — U.S. —, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990), as overruling *Goodman v. State*, 701 S.W.2d 850 (Tex.Crim.App.1985), *overruled on other grounds*, 757 S.W.2d 744 (Tex.Crim.App. 1988), holding that a "running objection" is insufficient to preserve error. The difficulty is that even if the "running objection" encompassed all previous objections, they were general objections not sufficient to preserve error.

Appellant contends that if the trial objections were not as precise as they could have been, the ground of the objection was

---

6. This action is the subject matter of appellant's sixth point of error.

obvious to the trial court and opposing counsel in the context in which made. *See Miller v. State,* 741 S.W.2d 382, 387 (Tex. Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988); *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim.App.1977); TEX.R.APP.P. 52(a). We observe that before Melissa testified about any statements made to Detective Mena, and after one of the "hearsay" objections, both parties told the court that they did not know what the witness was going to say. Appellant now urges that neither party was completely candid with the trial court, calling attention to some of her counsel's earlier remarks at trial.

An examination of the record, however, makes it clear that the "bootstrapping" or "straw-man ploy" complaint now urged on appeal was not obvious to the trial court at the time the trial objections were made. *See United States v. Johnson,* 802 F.2d at 1466 n. 18. Appellant's argument is without merit. The errors urged are directed to the court's action in permitting the introduction of evidence at the very time it was offered. For the reasons stated, appellant's points of error four and five are overruled.

We need not reach the State's further contention that no error is presented because Richard Lucio, Melissa's husband, testified, without objection, to essentially the same facts as the complained of testimony. The State urged that the hearsay nature of Lucio's testimony has no bearing on its probative value in the absence of an objection. *See Harris v. State,* 727 S.W.2d at 541; *Chambers v. State,* 711 S.W.2d at 247; TEX.R.CRIM.EVID. 802.

■ Appellant has attached to a supplemental brief uncertified copies of an indictment, waiver, and consent to stipulation of evidence supposedly from a subsequent guilty plea of Melissa Lucio to the offense of perjury. She urges that these instruments support her claim on appeal. Assertions in an appellate brief or attachments thereto that are not supported by the record will not be accepted as fact. *Vanderbilt v. State,* 629 S.W.2d 709, 717 (Tex.Crim.App.1981); *Herrin v. State,* 525

S.W.2d 27, 29 (Tex.Crim.App.1975). An appellate court is normally bound by the record before it. *Burns v. State,* 761 S.W.2d 486, 487 (Tex.App.—Corpus Christi 1988, pet. ref'd). A court of appeals cannot go to the record of another case for the purpose of considering matters not shown in the record of the case before it. *Young v. State,* 650 S.W.2d 457, 459 (Tex.App.— Houston [14th Dist.] 1982, no pet.). We will not consider the attachments.

■ In point of error number six, appellant contends that the trial court erred in admitting into evidence State's exhibit number 86, the written statement given by Melissa Lucio to Detective Mena, after she had unequivocally admitted having made such statement. Appellant argues that the instrument was admitted in violation of Rule 612(a) of the Texas Rules of Criminal Evidence. *See McGary v. State,* 750 S.W.2d 782, 787 (Tex.Crim.App.1988) (when a prior inconsistent statement is a writing and the witness unequivocally admits making the statement, the instrument itself is not admissible.); *Wood v. State,* 511 S.W.2d 37, 43 n. 1 (Tex.Crim.App.1974); *Cherb v. State,* 472 S.W.2d 273, 278 (Tex. Crim.App.1971).

■ The trial objections were "hearsay," "no probative value," and that the statement had been "declared false." The complaint on appeal does not comport with the trial objections. Nothing is presented for review. *Rezac,* 782 S.W.2d at 871; *Pyles,* 755 S.W.2d at 122; *Smith,* 683 S.W.2d at 407. Even if the trial objections had been based on Rule 612(a), it is observed that appellant introduced State's exhibit number 87, a written statement. Appellant elicited from Melissa Lucio that State's exhibit number 87 was the truth and that State's exhibit number 86 was a "lie." It was only after this that State's exhibit number 86 was introduced. It would clearly appear that the rule of optional completeness, TEX.R.CRIM.EVID. 107, prevailed over Rule 612, given the circumstances of the instant case. *See Foster v. State,* 779 S.W.2d 845, 855–56, 858 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1505, 108 L.Ed.2d 639

(1990) (the rule of optional completeness is meant to avoid misleading or confusing the jury and can permit the admission of otherwise inadmissible evidence). Appellant's sixth point of error is overruled.

■ In her seventh point of error, appellant asserts that the trial court erred in permitting the State to impeach its own witness, Melissa Pena Lucio, with prior oral statements made to Richard Lucio because the witness (Melissa) had declared the statement to be untrue, and Richard Lucio had been called as a witness solely to impeach Melissa Lucio, and to get inadmissible hearsay before the jury under the guise of impeachment.

Melissa Lucio had denied that appellant had told her that she (appellant) was seeking someone to kill the deceased, despite the witness's statement to the contrary given to Detective Mena. On direct examination Melissa also denied that she told Richard Lucio of any such conversation with appellant.

The State then called Richard Lucio, Melissa's husband, as a witness. The witness was asked if Melissa had ever told him that appellant had inquired about his availability as a killer of appellant's husband. The objection lodged was "for the same reasons." This apparently referred to the "hearsay" and the lack of a predicate for impeachment objections which had been made earlier. The objection was overruled. Richard Lucio then denied that his wife had made any such statement to him. Upon further interrogation, without objection, Richard Lucio testified that four or five days after the Folklife Festival in August 1986 Melissa had told him that appellant had informed her (Melissa) that she was going to hire someone to kill the deceased.

Richard also testified later, without objection, that he was present when Melissa gave her statement to Detective Mena. The record then reflects:

7. The State takes note that no limiting instruction was given as to Richard Lucio's testimony, and that the party seeking such limiting instruction has the burden of requesting one. *See*

Q. Okay, and is that what she told you pretty much in August of '86 that the defendant had said to her?

A. More or less.

■ First, we observe that the complaint on appeal that the witness was called solely for the purpose of impeachment and to get hearsay evidence before the jury under the guise of impeachment does not comport with the trial objections. Nothing is presented for review. *Pyles,* 755 S.W.2d at 122. Furthermore, for reasons discussed in our disposition of points of error four and five, the general objections were not sufficient to preserve error under Rule 607. Still further, a specific objection must be made each time an offer of inadmissible evidence is made in order to preserve any error for review. *Purtell v. State,* 761 S.W.2d 360, 368 (Tex.Crim.App.1988), *cert. denied,* 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989); *Hudson v. State,* 675 S.W.2d 507, 511 (Tex.Crim.App.1984). In addition, the improper admission of evidence is not reversible error when the same facts are proven by other unobjected-to testimony. *Anderson v. State,* 717 S.W.2d 622, 626–27 (Tex.Crim.App.1986); *East v. State,* 702 S.W.2d 606, 611 (Tex.Crim.App.), *cert. denied,* 474 U.S. 1000, 106 S.Ct. 418, 88 L.Ed.2d 368 (1985).[7]

■ As to appellant's claim that Richard Lucio was called solely for the purpose of impeachment of Melissa Lucio, we observe, as earlier noted in the opinion, that Richard Lucio testified as to appellant's efforts in getting Melissa to the defense counsel's office to retract her earlier statement to the police, and in offering him money. Attempts to suppress or fabricate evidence are admissible against a defendant. *See Johnson,* 583 S.W.2d at 409; *Billings v. State,* 725 S.W.2d 757, 762–63 (Tex.App.—Houston [14th Dist.] 1987, no pet.). It appears that the witness was not

*Plante v. State,* 692 S.W.2d 487, 493 (Tex.Crim. App.1985); *Hefner v. State,* 735 S.W.2d 608, 619 (Tex.App.—Dallas 1987, pet. ref'd); Tex.R.Crim. Evid. 105(a).

called for the sole purpose of impeachment. Point of error number seven is overruled.

In point of error number eight, appellant complains that the trial court erred in overruling her objections to five separate jury arguments in which the prosecutor, directly or by inference, asked the jury to consider impeachment evidence of Melissa Lucio as evidence of appellant's guilt.

Appellant's point of error is multifarious and presents nothing for review. *See Adkins v. State,* 764 S.W.2d 782, 785 (Tex. Crim.App.1988); *Cuevas v. State,* 742 S.W.2d 331, 335 n. 4 (Tex.Crim.App.1987), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988). Furthermore, the point is not briefed in accordance with TEX.R.APP.P. 74(f) as to each argument.

■ Nevertheless, an examination of the record shows that in two instances no objection was lodged as to the argument now complained of. A failure to object waives any complaint on appeal as to jury argument. *See Drew v. State,* 743 S.W.2d 207, 218 (Tex.Crim.App.1987); *Romo v. State,* 631 S.W.2d 504, 505 (Tex.Crim.App. 1982); TEX.R.APP.P. 52(a). In a third instance, the objection advanced at trial does not comport with the complaint on appeal and presents nothing for review. *See Harris v. State,* 784 S.W.2d 5, 14 (Tex.Crim. App.1989); *McGee v. State,* 774 S.W.2d 229, 240 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1535, 108 L.Ed.2d 774 (1990).

■ To the two remaining arguments appellant did timely object and was overruled by the trial court listening to those arguments. Reading the complained-of arguments in context, we find that the prosecutor was responding to appellant's counsel's attack upon the credibility of witnesses, which response was within the area of proper jury argument. *Jacobs v. State,* 787 S.W.2d 397, 406 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990); *Albiar v. State,* 739 S.W.2d 360, 362 (Tex.Crim.App.1987). It is improper to ask the jury to consider impeachment evidence as substantive evidence of guilt. However, the jury arguments must be analyzed in light of the entire argument made and not just isolated sentences. *See Drew,* 743 S.W.2d at 220–22; *Mosley v. State,* 686 S.W.2d 180, 183 (Tex.Crim.App.1985). We conclude that the trial court did not err in overruling the objections. Point of error number eight is overruled.

■ In points of error number nine and ten, appellant contends that improper jury argument occurred when the prosecutor asked the jury to consider impeachment evidence of the State's witness, Anselmo Martinez, as evidence of appellant's guilt.

Martinez, the owner of the bar to which the deceased ran and where he collapsed on the dance floor, gave some of the most damaging evidence against appellant. He testified that he asked the deceased in Spanish who "wounded" him and that the deceased responded in English that it was "his wife, brother-in-law and cousin." He insisted that this was all the deceased said to him. On cross-examination, Martinez admitted that he gave a statement to Detective Victor Mena which was dated September 25, 1986, some eleven days after the alleged offense. Martinez, a Puerto Rican, explained that he gave the statement in Spanish, that it was taken down in English and read back to him in English and Spanish. He testified at trial through the use of an interpreter. He acknowledged that the statement reflected that the deceased also told him that when he (the deceased) got to his wife's house "they jumped him from out of the restroom." Martinez stated that he did not know how those remarks got into the statement for the deceased told him only what he had revealed on direct examination; that either Mena had put it in the statement or someone had told him that, but he could not remember talking to anyone about the matter. The written statement, State's exhibit number 8, was introduced into evidence by appellant. The trial court gave a limiting jury charge restricting the use of the exhibit to the issue of Martinez's credibility as a witness.

During the closing argument for appellant, counsel spent a great deal of his time

attacking the credibility of Martinez. He listed ten "lies" or discrepancies in Martinez's testimony, including the "lie" involving the "jumped him out of the restroom" statement. In his closing argument, the prosecutor immediately responded with the complained-of argument:

Whether Marcos was there early or not. *Or whether he was jumped from the restroom. He was told that. You know he was told that. All the evidence shows that.*

MR. LEON: [defense counsel] Now, just a minute, Your Honor. We object. He's asking them to accept that as evidence of fact, and it's only for the purpose of impeachment, and we object to it.

THE COURT: It's overruled.

MR. KOPP: [prosecutor] *He was told about the restroom. Isn't that convenient that that's what the facts happened to show?* Isn't that convenient? He was told that Marcos—Marcos Hernandez[8] knew the deceased. Obviously, how else would it have got in here? He had been told that in the week or two afterwards.

MR. LEON: Now again, we object to that. He's referring to the evidence not for the purpose of impeachment or credibility, but he's claiming that we know that it happened, and that's improper argument. And we object to it because the statement was submitted solely for the purpose of impeachment in aiding and the credibility [sic], and not a substitute of evidence that it took place.

THE COURT: Overruled.

(Emphasis supplied.)[9]

 Within the area of proper jury argument are (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. *Kinnamon v. State,* 791 S.W.2d 84, 89 (Tex.Crim.App.1990); *Albiar,* 739 S.W.2d at 362. It is proper for a prosecutor to draw reasonable deductions from the evidence and to respond to arguments made by a defense counsel so long as he

does not exceed the scope of the invitation. *Andujo v. State,* 755 S.W.2d 138, 144 (Tex. Crim.App.1988). It is improper for a prosecutor, however, to ask a jury to consider evidence which is the subject of a limiting charge by the court as evidence of a defendant's guilt. *See Sanchez v. State,* 591 S.W.2d 500, 502 (Tex.Crim.App.1979).

 In the instant case, the prosecutor was making reasonable deductions from the evidence and responding to defense counsel's argument of "ten lies" when the complained-of remarks were made. In reading the argument in context, it appears that the prosecutor was arguing that between the time of the alleged offense and the time of the statement to Mena, Martinez had been told about the deceased being "jumped out of the restroom"; that this was likely because other evidence supports that fact; and that in the translation from Spanish into English that fact had been included in the written statement. Jury argument must be analyzed in light of the entire argument and not just isolated sentences. *Drew,* 743 S.W.2d at 220–22; *Henson v. State,* 683 S.W.2d 702, 704 (Tex. Crim.App.1984). We conclude that the trial court, who heard the argument, did not err in overruling appellant's objections. Points of error nine and ten are overruled.

In point of error number eleven, appellant contends that the trial court erred in admitting prejudicial evidence of the results of a paternity test that indicated that appellant's husband (the deceased) was not the father of her child.

Appellant appears to argue that the results of the paternity test, if relevant at all, were inadmissible because "the prejudicial effect of admitting the evidence of the paternity test outweighed any probative value the paternity test might have had." Appellant cites Rules 401 and 403 of the Texas Rules of Criminal Evidence. It appears that appellant objected that no motive had been established and that the results of the test were "not relevant," "highly prejudicial," "hearsay," and that their use was

---

**8.** The prosecutor was apparently referring to Marcos Morales, not Hernandez.

**9.** The emphasized portion of the argument is that which appellant complains of on appeal.

**742** ■■■■■■■■■■■■■■■■■■■

"an attempt to bastardize the child" against public policy.

■■■■■■ A general objection at trial presents nothing for review. *Lewis,* 664 S.W.2d at 349; *Williams,* 596 S.W.2d at 866; *Gonzales,* 775 S.W.2d at 778. A general objection of "relevancy" or of "hearsay" present nothing for review. *James v. State,* 772 S.W.2d 84, 99–100 (Tex.Crim. App.1989), *vacated,* — U.S. ——, 110 S.Ct. 225, 107 L.Ed.2d 178 (1989); *see Lewis,* 664 S.W.2d at 349.

■■■■■■ Evidence of motive is always admissible as a circumstance indicating guilt. *See Harris,* 727 S.W.2d at 542; *Bush v. State,* 628 S.W.2d 441, 444 (Tex. Crim.App.1982). Proof that the deceased was not the natural father of the child was probative value of motive. Appellant was made aware that the results of the tests would be available in about two weeks. The results could have seriously affected appellant's remaining the beneficiary on the deceased's life insurance policy and the share she might receive from the personal injury settlement. Thus, the evidence was relevant. TEX.R.CRIM.EVID. 401. As the appellant's claim of "prejudicial" evidence the burden was on her to show that the probative value was substantially outweighed by the danger of unfair prejudice. TEX.R.CRIM.EVID. 403; *see Crank v. State,* 761 S.W.2d 328, 342 (Tex.Crim.App. 1988), *cert. denied,* — U.S. ——, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989). Appellant did not sustain her burden. The trial court did not err in permitting the admission of the evidence. Point of error eleven is overruled.

The judgment is affirmed.