OPINION

No. 04-04-00080-CR

Ronald A. EBY,
Appellant

v.

The STATE of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2003-CR-2889
Honorable Philip Kazen, Jr., Judge Presiding
 
Opinion by:    Catherine Stone, Justice
 
Sitting:            Catherine Stone, Justice
Sarah B. Duncan, Justice
Karen Angelini, Justice
 
Delivered and Filed:   April 6, 2005

REVERSED AND REMANDED
            Ronald Eby appeals his conviction and life sentence for murdering Roland Cervera. Because
there is factually insufficient evidence to support Eby’s conviction, we reverse the trial court’s
judgment and remand the cause for a new trial.
 
 
BackgroundIn April of 1998, Roland Cervera was in the process of purchasing a piece of property in 
rural southeast Bexar County, Texas. Before the sale of the property was complete, Cervera, with
the approval of his realtor, Constance Friesenhahn, began renovating the property. On April 8, 1998,
Friesenhahn drove by Cervera’s property and noticed Cervera’s truck parked near the residence. 
When Friesenhan drove by the property again on April 10, 1998, she noticed Cervera’s truck had not
moved since the last time she drove by the property. 
            Friesenhahn contacted an adjacent landowner, Bart Moczygemba, to have him check on
Cervera. Moczygemba drove to Cervera’s property on April 11, 1998. Moczygemba noticed 
Cervera’s truck parked in front of the garage and observed a dog chained to Cervera’s truck. 
Moczygemba, unable to enter the garage due to the dog, peered into the open garage door and saw
an interior door ajar.


 After calling out for Cervera and receiving no response, Moczygemba left the
property. 
            When Friesenhahn drove by Cervera’s property on April 12, 1998, she again noticed that
Cervera’s truck had not moved. Finally, on April 13, 1998, Friesenhahn contacted the Bexar County
Constable’s Office to check on Cervera. Later that same day, at around 6:00 p.m., Constable
Reynaldo Guttierrez met Friesenhahn at Cervera’s property. 
            Upon arriving at the property, Constable Guttierrez smelled a foul odor coming from
Cervera’s residence and saw flies on an inside window. Guttierrez immediately called for assistance. 
When his back-up arrived, Gutierrez entered the residence through the open door in the garage. As
he did, he observed Cervera’s body lying on the ground. Pursuant to standard operating procedure,
Gutierrez notified the Bexar County Sheriff’s Office to report Cervera’s death.
            Adrian Ramirez, an Evidence Technician from the Bexar County Sheriff’s Office, was
dispatched to the crime scene. When Ramirez entered the room where Cervera’s body was located,
he observed blood splatter and blood smears on the walls, ceiling, curtains, and windows. He also
saw Cervera’s decomposing body lying on the ground near a wood stove. According to Ramirez, 
there were bloody footprints throughout the residence. 
            Authorities conducted a search of Cervera’s property and person. The search of Cervera’s
person revealed a wallet containing his identification and one dollar. The only items collected from
inside Cervera’s residence were an unopened package of Swisher Sweet cigars, a baseball cap, four
unopened cans of Lone Star beer, blood samples, and kitchen tiles with bloody footprints on them. 
Authorities also processed Cervera’s vehicle and recovered the following items: a bottle of Old
Milwaukee beer; several empty Lone Star beer cans; and two Church’s Chicken boxes containing
plastic utensils. The search of Cervera’s property revealed a set of keys lying near the front gate of
the property. Authorities were unable to locate the murder weapon.
            An autopsy of Cervera’s body revealed that Cervera died of blunt force trauma to the head. 
Medical Examiners determined Cervera died anywhere from 48 hours to a week before his body was
found. DNA testing performed on genetic material collected from Cervera’s finger nails did not
produce any evidence for the authorities.
            Kenneth Steward was the officer assigned to lead Cervera’s murder investigation. Based
on Steward’s initial observation of the crime scene, he believed one assailant committed the crime
and that the crime was not motivated by burglary or robbery. Steward interviewed various residents
of the mobile home park where Cervera resided before his death, including Paul Wolds, Marion
Hardin, Mary Hardin, and Richard Houghtling. From these interviews, Steward learned that Mary
Hardin saw Cervera alive on April 8, 1998 in the presence of Cervera’s acquaintance, Alvin
Lindblom. According to Hardin, she saw Cervera and Alvin at Cervera’s mobile home loading a
lawnmower onto a truck. Steward also learned that many of the witnesses were afraid Alvin would
retaliate against them for talking to the officer. Based on the information he received from the
witnesses, Steward developed Alvin as a murder suspect.
            When Steward interviewed Alvin regarding the murder, Alvin denied ever having been to
Cervera’s property. Alvin told Steward that he had last seen Cervera alive about a week before
Cervera’s body was discovered. Following his interview with Alvin, Steward proceeded to interview
Eby and his wife, Debra Gallego. 
            Debra informed Steward that she was previously married to Cervera and had one child with
him, Timmy. She stated that she was now married to Eby. Debra informed Steward that she had
helped Cervera work at his new property all day on April 5 and April 6, 1998. She told Steward that
Eby knew she was helping Cervera at the property on those days. Debra also told Steward that
Cervera had caught five youths trespassing on his property a couple of weeks before his death, and
that the youths had threatened him. 
            Steward interviewed Eby on April 26, 1998. Eby provided Steward with a written statement
denying any knowledge of Cervera’s murder. Eby stated that the last time he saw Cervera was in
the latter part of 1997, when Cervera came by his residence for Timmy. When questioned regarding
his whereabouts from April 5 to April 13, 1998, Eby stated: on April 5, he was with his children until
6:00 p.m., at which time he dropped them off at his grandmother’s house. He returned home at 7:30
p.m., where he stayed until the next morning; on April 6, he left for work at 7:45 a.m. and arrived
home at 5:10 p.m., where he stayed until the next morning;


 on April 7th, he left for work at 7:45
a.m. and arrived home at 1:00 p.m. because he felt ill.


 He remained at home until the next morning;
on April 8, he left for work at 7:45 a.m. and arrived home at 5:10 p.m., where he stayed until the next
morning; on April 9, 1998, he left for work at 7:45 a.m. and arrived home at 5:45 p.m., where he
stayed until the next morning; on April 10, he was at home all day with his wife and son cleaning
their house until 8:00 p.m., at which time they left for Canyon Lake. He stayed with his family at
Canyon Lake until April 12.


 
            Steward obtained Eby’s work records from Eby’s employer, San Antonio Water System. 
From these records, Steward learned Eby was a field conservation technician. As a field
conservation technician, Eby had his own work vehicle and worked unsupervised throughout the day. 
Steward’s search of Eby’s work vehicle, however, did not produce any evidence concerning
Cervera’s murder. 
            Steward also spoke with the shoe distributor that provides SAWS employees with their
footwear. The distributor informed Steward that it sold work boots with tread patterns similar to the
imprints found at the crime scene. However, none of the work boots the distributor provided to Eby
had such treads. Based on Steward’s investigation, both Eby and Alvin were considered potential
suspects. 
            Dalton Baker eventually took over Cervera’s murder investigation sometime during 1999. 
Baker, who was at the crime scene the day Cervera’s body was discovered, believed Cervera had
been beaten to death by someone using a baseball bat. He began his investigation by reviewing the
file prepared by Steward. He also interviewed Alvin Lindblom, Richard Houghtling, Connie
Almand, Roland Almand, Mike Neely, John Hardin, Steven Hardin, Billy Bain, Ramiro Cervera,
Ronald Lindblom, and Paul Wold. From his interviews, Baker developed Alvin Lindblom as a
suspect because Alvin had described the crime scene and Cervera’s death in detail to several of the
witnesses. Baker’s investigation eventually led to Alvin’s arrest on May 5, 1999. Alvin was later
indicted for Cervera’s murder. The case, however, was dismissed on September 6, 2000 for further
investigation. 
            By June of 2002, Jeffrey Robertson of the Texas Rangers had taken over Cervera’s murder
investigation. When he took over, Robertson reviewed all of the offense reports, witness statements,
and crime scene photographs/diagrams. In examining all of the evidence, Robertson concluded one
person committed the murder by striking Cervera multiple times in the head with a blunt object. 
            Robertson stated that he interviewed Mike Neely, Paul Wold, Richard Houghtling, Ronald
Lindblom, Eby, and Debra. None of the witnesses provided Robertson with any new information
except for Debra, who stated she remembered eating Church’s Chicken with Cervera at Cervera’s
property sometime before his death.


 Robertson did not re-interview Alvin, Steve Hardin, John
Hardin, Mary Hardin, Connie Almand, or Roland Almand.
            In November of 2002, the genetic material collected from Cervera’s fingernails was subjected
to advanced DNA testing procedures. It is unclear whether this DNA evidence was actually
collected from underneath Cervera’s fingernails. The DNA testing procedures revealed that Eby’s
DNA matched DNA found on the fingernails. Based on this DNA evidence, Robertson concluded
Eby was the perpetrator of the offense. The newly discovered DNA evidence led to Eby’s arrest and
indictment for murder. 
            During Eby’s trial, multiple witnesses testified for both the State and the defense. Texas
Ranger Robertson testified that he considered all of the offense reports, witnesses statements, and
other evidence in the case before arresting Eby. He stated he considered that: Alvin indicated to his
brother that he may have killed Cervera; Cervera and Alvin were seen together at Cervera’s property
shortly before the murder; Alvin showed up at Mike Neely’s home around the time of the murder
with blood on his shirt and in possession of a large wad of cash, bragging about beating up a man
and taking his money; Alvin was violent and a drug abuser; Alvin smoked Swisher Sweet cigars and
drank Old Milwaukee beer; and a baseball bat was missing from the residence where Alvin resided
at the time of the murder. According to Robertson, he did not believe there was sufficient evidence
indicating Alvin was the murderer. 
            Robertson explained that he did not believe any of the witnesses’ statements implicating
Alvin as the perpetrator because he found such statements to be unbelievable. Robertson stated he
discredited the statements because they were made after the witnesses had an opportunity to converse
about the murder. Robertson conceded, however, that he did not personally interview several of the
witnesses he claimed to be unbelievable. Robertson further testified that he excluded Alvin as a
suspect when he learned Alvin’s DNA did not match any of the DNA found at the crime scene.
            Dr. Randall Frost, a forensic pathologist, testified an autopsy of Cervera’s body revealed that
Cervera died of blunt force trauma to the head. Frost stated that Cervera suffered extensive
fracturing to his head and face. He also stated Cervera had several large lacerations on the back of
his head and two smaller lacerations on the front of his head. Cervera’s body, however, had no other
lacerations, broken bones, or other visible injuries. Frost estimated that Cervera’s death occurred
“anywhere from 48 hours on out to several more days, maybe as much as a week” before his body
was found by authorities. He further testified that the perpetrator of the offense could have had
Cervera’s blood transferred to him or her during the attack. 
            Jack McElligott, owner of Safety Shoe Distributors, testified his company sold boots with
treads capable of making the imprints found at the crime scene. McElligott testified that Eby
purchased five different pairs of boots from his company; however, none of the boots had treads
capable of making the imprints left at the crime scene. 
            Henry Amen, a trace evidence expert, testified that the measurement of the bloody shoe
impressions left at the crime scene measured 12.1 inches in length. According to Amen, this imprint
length translated into a casual or athletic shoe size range of 11 to12.5.


 Amen further noted that a
12.1 imprint length would translate into a work boot size range of 8 to 10.


 Amen stated that he
could not specifically identify the size or style of the footwear that left the imprints at the crime
scene.
            Humberto Ramos, an employee of SAWS, described Eby’s job at SAWS. Ramos explained
that Eby had a work vehicle and worked unsupervised. According to Ramos, Eby’s job required him
to travel to different sites throughout San Antonio. He stated Eby typically worked from 7:45 a.m.
until 4:30 p.m. Ramos stated records from SAWS reflect that Eby took two and one half hours of
leave on April 6, 1998 and five and one quarter hours of leave on April 7, 1998. He also stated Eby
filed an accident report on April 14, 1998, claiming he injured his finger while handling a toilet on
April 13, 1998.
            Dr. Carlos Porter testified he treated Eby for a laceration on his ring finger on April 13, 1998,
at around 10:40 a.m. Porter stated Eby’s laceration required sutures. He estimated Eby’s injury was
“definitely less than 24 hours old.” 
            Garon Foster, a technical leader of the forensic serology DNA section at the criminal
investigation laboratory, testified about the transfer of DNA between individuals. Foster stated that
a person can get DNA on his fingernails from multiple sources, including saliva, the skin from inside
the mouth, blood, and semen. According to Foster, DNA can be transferred by a fingernail scratch
to an individual’s skin; however, the scratch must penetrate into the person’s living tissue. Foster
also stated DNA can be transferred by a fingernail scratch to an individual’s skin if there is genetic
material, like saliva, on the surface of the skin.
            Foster further explained that DNA can be transferred from one person to another without any
direct contact between the individuals. He stated that there is no way to determine if something is
secondarily transferred or not. Foster opined that it is possible for DNA to be transferred from a
person to a pair of work gloves. For example, Foster indicated that DNA may be transferred from
a person to a pair of work gloves if, before the individual puts on the gloves, the person wounds his
hand in some way, spits on his hands, or uses his hands to scratch himself. Foster testified that he
has documented many instances of secondary DNA transfer in his career.
               Ramiro Cervera, Cervera’s brother, testified Cervera introduced him to Alvin Lindblom 
two weeks before his death. Ramiro stated his brother brought Alvin to his house to borrow a
lawnmower. He stated Alvin made him uncomfortable and he did not want Cervera associating with 
Alvin. 
            Officer Dalton Baker was called to testify regarding his participation in the murder
investigation. Based on his investigation of the crime scene and interviews with approximately ten
witnesses, Baker stated he developed Alvin as a suspect. According to Baker, Alvin knew the
manner and means of Cervera’s death, and consistently described the crime scene and Cervera’s
death to multiple people. Consequently, Baker concluded Alvin murdered Cervera. He further
concluded Alvin committed the murder with a baseball bat. Dalton stated that his investigation led
to Alvin’s arrest and indictment for Cervera’s murder. Dalton admitted that at the time he made his
conclusion about Alvin, he did not know Eby’s DNA was present on Cervera’s fingernails. 
            Connie Almand, one of Cervera’s neighbors, testified that she, along with her daughter and
future husband Steven Hardin, lived with her father, Richard Houghtling, before Cervera’s death. 
When Connie and her family moved out of Houghtling’s residence, her daughter left behind some
of her belongings, including a baseball bat and glove. Alvin moved into Houghtling’s residence after
Connie and her family moved out. Alvin stayed in Connie’s daughter’s old bedroom, where her
baseball bat was kept. Connie stated she searched for her daughter’s baseball bat after learning 
Cervera may have been murdered with one. She testified that Alvin discovered her looking for the
bat and appeared to be worried about “people searching through his stuff.” Connie stated she was
unable to find her daughter’s baseball bat. 
            Connie also recalled that Alvin and another individual came by her residence one morning
at 3:00 a.m. before Cervera’s body was discovered. According to Connie, the men were looking for
her husband to help them purchase cocaine. Connie noticed that the individual with Alvin had a
light red mark on his face, which she described as either a slap mark or an attempt to rub something
off his face. She stated that both Alvin and his companion were drunk and bragging about being in
a fight, beating somebody up, and taking all of the person’s money. Connie further testified that she
remembered seeing Alvin and Paul Wold load a lawn mower onto a trailer, and saw Alvin drive off
with the lawnmower. Alvin told Connie that he was helping Cervera clear his property and that
Cervera “was going to pay him real good.” 
            Richard Houghtling, one of Cervera’s neighbors, testified that he rented a room to Alvin. 
Houghtling stated that when authorities came looking for Alvin after the murder, Alvin “took off
before they got there.” He stated that his granddaughter’s baseball bat was missing from his
residence. Houghtling indicated Alvin had a reputation for drugs and drinking, and he had observed
Alvin strung out on cocaine to the point where Alvin did not know what he was doing. Houghtling
also stated Alvin had a quick temper, and often appeared “beat up pretty bad.” When Alvin learned
that Houghtling had talked to the authorities, Alvin threatened to physically harm Houghtling.             Eby testified on his own behalf during trial. He denied murdering Cervera. Eby stated that
he knew Debra still spoke with Cervera through a pager and that Cervera had purchased a vehicle
for her. According to Eby, he had never personally met Cervera or visited his property. Eby stated
that he knew Cervera was purchasing a piece of property so that Timmy could visit with him. He
stated he and Debra had some concerns for Timmy’s safety at the property due to its poor condition.
When Debra went to help Cervera clean the property, she took a pair of his well-worn leather gloves
and some of his shop rags with her. Eby never saw his gloves or rags again. 
            Eby testified that all of his work boots were in his closet at the time the authorities searched
his residence. Eby further testified Debra was a beneficiary under Cervera’s life insurance policy,
but that he did not learn she was a beneficiary until about a year after Cervera’s death. Eby could
not recall how much insurance proceeds Debra received after Cervera’s death. Eby also testified that
he declared bankruptcy about six months after Cervera’s death. 
            Debra also testified on Eby’s behalf. Debra testified that Cervera knew that she and Eby
were married. She stated that although she and Eby were married, she still communicated with
Cervera through a pager. Debra testified that Cervera purchased his property to provide a better
place for his children. When Debra went to help Cervera clean the property, she took a pair of Eby’s
gloves and some of Eby’s rags with her. Debra testified she used Eby’s gloves to clean debris in
Cervera’s kitchen and that Cervera subsequently used the gloves when he cut some tall grass. Debra
indicated that she worked with Cervera on both April 5 and April 6, 1998. When she left Cervera’s
property on April 6, she did not take Eby’s gloves or rags with her, and never saw them again. Debra
testified that she did not know she was a beneficiary under Cervera’s life insurance policy, and stated
she received between $30,000 and $40,000 from the insurance company after his death. 
            After lengthy deliberations, the jury found Eby guilty of murder. Eby was sentenced to life
in prison and this appeal followed.     
Sufficiency of the Evidence
A. Legal Sufficiency Challenge
            In his first issue, Eby contends the evidence is legally insufficient to support his conviction. 
The standard for reviewing a challenge to the legal sufficiency of the evidence is the same for both
direct and circumstantial evidence cases. Sutherlin v. State, 682 S.W.2d 546, 548-49 (Tex. Crim.
App. 1984). When a party attacks the legal sufficiency of the evidence, we view the evidence in a
light most favorable to the verdict and determine whether any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319 (1979); Mason v. State, 905 S.W.2d 570, 574 (Tex. Crim. App. 1995). In our review, we must
evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or
inadmissible. Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Although our analysis
considers all the evidence presented at trial, we may not re-evaluate the weight and credibility of the
record evidence and substitute our judgment for that of the jury. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000); Dewberry, 4 S.W.3d at 740. If any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt, we must affirm the trial court’s
judgment. McDuff v. State, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).
            After reviewing the evidence in this case, we hold that the evidence is legally sufficient to
support Eby’s conviction. Eby does not dispute that Cervera was murdered, see Tex. Pen. Code
Ann. § 19.02 (Vernon 2003); rather, he disputes that he was the person who committed the murder. 
The record indicates that Eby may have had a motive to kill Cervera. Around the time of the murder,
Eby was facing financial troubles that ultimately forced him to declare bankruptcy. Coincidentally,
Eby’s wife, Debra, was a beneficiary under Cervera’s life insurance policy and was scheduled to
receive between $30,000 and $40,000 upon Cervera’s death. The record also reveals that Eby had
an opportunity to commit Cervera’s murder during the time period it is alleged to have occurred, as
Eby worked unsupervised throughout the week. The record further reveals that DNA consistent with
Eby’s DNA was found at the crime scene on Cervera’s fingernails. Lastly, Eby’s work boot size falls
within the range of sizes experts believe could have made the imprints found at the crime scene. 
Examining all the evidence in the light most favorable to the verdict, we hold any rational trier of
fact could have found the essential elements of the offense beyond a reasonable doubt. Eby’s first
issue is therefore overruled.
B. Factual Sufficiency Challenge
            In his second issue, Eby contends the evidence is factually insufficient to support his
conviction. The standard for reviewing a challenge to the factual sufficiency of the evidence is the
same for both direct and circumstantial evidence cases. King, 29 S.W.3d at 565. When reviewing
the factual sufficiency of the evidence, there is only one question to be answered: considering all of
the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable
doubt? Zuniga v. State, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004). There are two ways in which
evidence may be factually insufficient. Id. “First, when considered by itself, evidence supporting
the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Id. Second,
there may be both evidence supporting the verdict and evidence contrary to the verdict. Id. Weighing
all the evidence under this balancing scale, the contrary evidence may be strong enough that the
beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand.” 
Id. at. 485. 
            In a factual sufficiency review, we give deference to the jury’s determinations, including
determinations involving the credibility and demeanor of witnesses. Cain v. State, 958 S.W.2d 404,
407 (Tex. Crim. App. 1997). We may not substitute our judgment for that of the jury. Zuniga, 144
S.W.3d at 482. Moreover, we will not set aside the judgment unless the jury’s verdict was clearly
wrong and manifestly unjust, i.e., where the jury’s finding “shocks the conscience” or “clearly
demonstrates bias.” Id. at 481.
            After reviewing all of the relevant evidence in a neutral light, it is evident that the evidence
contrary to the verdict is strong enough such that the beyond-a-reasonable-doubt standard could not
have been met in this case. We therefore hold that the evidence is factually insufficient to support
Eby’s conviction. 
            The case for the prosecution was entirely circumstantial. The State believed Eby murdered
Cervera sometime between the dates of April 6 and April 13, 1998, with a particular emphasis on
April 6 and April 7 because Eby took leave from work on those days. The State surmised that Eby
murdered Cervera for his insurance proceeds or because Cervera was having an affair with his wife. 
In support of its case, the State emphasized the fact that DNA consistent with Eby’s DNA was found
on Cervera’s fingernails. The State theorized that this DNA likely came from the finger laceration
Eby sought medical treatment for on the day Cervera’s body was discovered. The State also
emphasized that the length of the bloody footprints found at the crime scene correlate to Eby’s work
boot size. Lastly, the State noted that Eby purchased his footwear from a company (Safety Shoe
Distributors) that sells boots with treads capable of making the imprints found at the crime scene. 
            With respect to this evidence, there are several points worth noting. First, it was undisputed
during trial that witnesses saw Cervera alive as late as April 8, 1998. Second, there is no evidence
that Debra and Cervera were having an affair, or if they were, that Eby was aware of the affair. Nor
is there any evidence demonstrating that Eby knew Debra was a beneficiary under Cervera’s
insurance policy at the time of the murder. Third, the record indicates that DNA may be transferred
from one person to another without any direct contact between the individuals, including by way of
a pair of work gloves. Fifth, the record indicates that the injury Eby sustained to his finger occurred
sometime after Cervera’s death. The record reveals that Cervera’s body was discovered sometime
after 6:00 p.m. on April 13, 1998. According to medical testimony, Cervera died anywhere from 48
hours to as long as a week before his body was finally discovered. Eby’s injury, however, was less
than 24 hours old when he sought treatment for it at 10:40 a.m. on April 13, 1998. Sixth, the witness
who testified concerning the length of the footprints left at the crime scene explained that the
footprints correspond to either a size 8 to 10 work boot or a size 11 to 12.5 casual/athletic shoe. 
According to the witness, he could not identify the actual size or style of the footwear leaving the
imprints. Lastly, the record indicates that Eby never purchased a pair of work boots from Safety
Shoe Distributors with treads capable of making the imprints found at the crime scene.
            Besides the aforementioned evidence, the record includes evidence that Cervera was last seen
in the presence of Alvin Lindblom, a violent individual with a quick temper. Around the alleged time
of the murder, Alvin appeared at several of Cervera’s neighbor’s homes in possession of a large sum
of money, bragging about beating someone up and taking the person’s money. One of the neighbors
even indicated that Alvin was wearing a bloody shirt at the time he appeared at his home. In the
months following this event, Alvin described the crime scene and Cervera’s death to various
individuals. In fact, Alvin confessed to his brother that he bludgeoned Cervera with a baseball bat.
            Finally, the record includes evidence that Alvin resided with Richard Houghtling at the time
of the murder. According to witness testimony, Alvin stayed in a bedroom where a baseball bat was
kept. After Cervera’s murder was discovered, this baseball bat was discovered missing from Alvin’s
room. The record indicates that Alvin appeared worried when he discovered “people searching
through his stuff” after Cervera’s murder. When Alvin learned Houghtling had talked to the
authorities about the murder, Alvin threatened Houghtling with physical harm. 
            In light of the record before us, we must conclude that the evidence contrary to the verdict
is strong enough such that the beyond-a-reasonable-doubt standard could not have been met in this
case. Because we believe the jury’s verdict is clearly wrong and manifestly unjust, we hold there is
factually insufficient evidence to support Eby’s conviction. See Zuniga, 144 S.W.3d at 481. We
therefore sustain Eby’s second issue.
            Although we have determined that the trial court’s judgment must be reversed and the cause
remanded for a new trial, we deem it advisable to address several additional issues that will
undoubtedly confront the trial court on remand. 
Hearsay EvidenceIn his third issue, Eby argues the trial court should have admitted the testimony of Officer
Dalton Baker, John Hardin, and Ronald Lindblom concerning the out-of-court statements made by
Alvin relating to the murder. Neither party disputes that the statements in question are hearsay.
Hearsay is inadmissable unless expressly excepted or excluded from the general rule by statute or
the rules of evidence. Tex. R. Evid. 802. One such exception is statements against interest. See Tex.
R. Evid. 803(24). A statement against interest is a statement at the time of its making that was so
far contrary to the declarant’s interest or so far tended to subject the declarant to criminal liability,
a reasonable person in the declarant’s position would not have made it unless he believed it to be
true. Id. 
            For a statement to be admissible under Rule 803(24), two requirements must be met: (1) the
statement in question must expose the declarant to criminal liability; and (2) there must be
corroborating circumstances that clearly indicate the trustworthiness of the statement. Bingham v.
State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). The party seeking admission of the statement has
the burden of producing corroborating evidence to prove the trustworthiness of the statement. 
Cofield v. State, 891 S.W.2d 952, 955 (Tex. Crim App. 1994). There is no definitive test to
determine whether corroborating circumstances exist for purposes of Rule 803(24). “Any number
of factors may be considered in this inquiry, including whether the guilt of the declarant is
inconsistent with the guilt of the accused, whether the declarant was so situated that he might have
committed the crime, the timing of the declaration and its spontaneity, the relationship between the
declarant and the party to whom the declaration was made, and the existence of independent
corroborating facts.” Davis v. State, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994). 
            The court is required to consider both circumstances which support as well as those which
undermine the reliability of the declarant. Id. However, the court is not to “consider the ‘credibility
of the in-court witness,’ since credibility presents an issue for the jury.” Fonseca v. State, 908
S.W.2d 519, 522 (Tex. App.—San Antonio 1995, no pet.). “The overriding consideration is that the
requirement of corroboration should be utilized and construed in such a manner as to effectuate its
purpose of circumventing fabrication.” Cunningham v. State, 877 S.W.2d 310, 312 (Tex. Crim.
App. 1994). 
            Eby’s defense at trial was misidentification. In support of that defense, Eby sought to
introduce testimony from Officer Baker, John Hardin, and Roland Lindblom, indicating Eby was not
the perpetrator of the offense. The trial court, however, sustained the State’s objection that this
testimony was inadmissible hearsay. 
            Eby sought to introduce testimony from Officer Baker concerning the statements he obtained
from Alvin while Alvin was in police custody. During the first interview with Baker, Alvin denied
murdering Cervera or having any knowledge of the murder. Alvin later stated, that if he did commit
the crime, he did not remember it because he was “all fired up on cocaine.” Alvin admitted that he
was in possession of a large sum of money around the time of Cervera’s death, but claimed he had
borrowed the money from one of his brothers. He later admitted having taken the money from his
brother. Alvin stated he had made up the story about beating someone up and taking the person’s
money in case his brother discovered the missing money. 
            Alvin also denied having blood on his shirt or attempting to borrow a shirt from one of his
neighbors around the time of the murder. He later admitted to having blood on his shirt from
butchering an emu. Alvin later changed his story, claiming his shirt was bloody because he had just
“beat up a man.” Alvin, however, again changed his story, claiming he tore his shirt himself to make
it look as though he had been in a fight. Alvin told Baker that he smoked Swisher Sweet cigars and
drank Old Milwaukee beer.
            Eby also sought to introduce the testimony of John Hardin concerning statements Alvin made
to him in November of 1998. According to Hardin, Alvin told him that an individual had hired
Alvin, Alvin’s brother (Ronnie), and Clay Holsten to renovate a piece of property the individual was
in the process of purchasing. When the three men went to the property to drop off a lawnmower,
Alvin allegedly killed the guy with a baseball bat and stole a large sum of money from the guy. 
Alvin revealed that he “beat the shit out of [the guy] and crushed his face.” Alvin also stated “he
beat the guy so bad that the floors, walls, and ceiling [were] covered in blood.” 
            After the men left the individual’s property, Alvin returned to his trailer park to get a clean
shirt because his was covered in blood. Alvin attempted to borrow a shirt from one of his neighbors
but the neighbor refused to loan him one. Alvin subsequently met up with his friend Benny McBain
and attempted to purchase cocaine from one of Alvin’s neighbors. Hardin stated that Alvin burned
his clothing and painted his truck white to hide it after the murder.
            In addition, Eby sought to introduce the statements of Roland Lindblom concerning Alvin’s
prior statements about Cervera’s death.


 Sometime around the end of April 1998, Alvin told Roland
that he had repaired a lawnmower for Cervera. When Alvin returned the lawnmower to Cervera,
Alvin, along with an individual named McBain, hit Cervera in the head with a baseball bat. Alvin
and McBain took Cervera’s money after they knocked him out with the baseball bat. After the
incident, Alvin painted the truck he used to tow the lawnmower to Cervera’s property white.
            It is beyond question that the statements Alvin made to Officer Baker, Hardin, and Roland
implicated Alvin in Cervera’s murder, and thus tended to expose him to criminal liability. The
pertinent inquiry then is whether corroborating circumstances clearly indicate the trustworthiness of
the statements. See Bingham, 987 S.W.2d at 57. Here, it appears that there are corroborating
circumstances indicating the trustworthiness of the statements. 
            First, the investigating officers in this case revealed that they believed only one person
committed Cervera’s murder, citing the fact that there was only one set of bloody footprints at the
crime scene. Alvin’s confession of guilt was therefore inconsistent with the guilt of anyone else,
including Eby, because only one person could have committed the crime. Second, the record reveals
that Alvin was known to be working for Cervera at the property Cervera was purchasing. Alvin was
seen in Cervera’s presence on multiple occasions, including April 8, 1998, a date right around the
time the murder was alleged to have occurred. Alvin was thus situated to have committed Cervera’s
murder. Third, the majority of Alvin’s statements were made at a time when the police were still
investigating who had committed Cervera’s murder.


 Fourth, the majority of Alvin’s statements
were spontaneous and made to either a relative or a criminal acquaintance not connected with the
commission of the alleged offense.


 
            Finally, Eby developed independent corroborative facts that verified the reliability of Alvin’s
statements to Officer Baker, Roland, and Hardin. In the alleged statement to Officer Baker, Alvin
admitted possessing a large sum of money and appearing at one of his neighbor’s houses with blood
on his shirt around the time of the murder. The evidence in the record reveals that Alvin and another
individual appeared at Connie Almand’s residence one morning bragging about stealing someone’s
money. The record also reveals that Mike Neely, one of Alvin’s neighbors, told authorities Alvin
appeared at his house one night around the time of the murder wearing a bloody shirt, bragging about
beating someone up and taking the person’s money.
            Alvin’s alleged statements to Roland and Hardin about striking Cervera with a baseball bat
are consistent with the physical evidence, as Cervera’s head injuries were consistent with being
struck with a blunt object like a baseball bat. The statements are further corroborated by the fact that
Alvin told multiple people that he struck Cervera in the head with a baseball bat and stole his 
money.
            In the alleged statements to Hardin, Alvin described the extent of the blood splatter on the
floors, walls, and ceiling; indicated that he appeared at one of his neighbor’s houses wearing a
bloody shirt; and indicated that he went to his trailer park after the murder to purchase cocaine. The
evidence in the record reveals Alvin’s statements regarding the crime scene blood splatter were
consistent with the physical evidence. The evidence also reveals that Alvin appeared at Connie
Almand’s residence one morning around the time of the murder looking for her husband to purchase
cocaine.


 Lastly, as previously discussed, the record indicates Alvin appeared at Mike Neely’s
house around the time of the murder wearing a bloody shirt.
            The record, however, also includes evidence indicating some of Alvin’s statements may be
untrustworthy. Alvin’s statements to Hardin were made at a time when Alvin was allegedly
intoxicated and his statements to Baker were made in response to police interrogation. Also, Alvin’s
statements to Roland and Hardin were inconsistent regarding who accompanied Alvin when he went
to Cervera’s property. The record indicates that Roland alleges McBain was with Alvin at the time
of the murder, while Hardin alleges Ronnie Lindblom and an individual named Clay were with
Alvin. Further, no murder weapon was ever recovered in this case, so it is unclear whether a
baseball bat was in fact the weapon used to bludgeon Cervera.



            Considering the relevant factors, it appears the corroborating evidence, even in light of
evidence tending to undermine the trustworthiness of Alvin’s statements, is sufficiently convincing
to indicate trustworthiness. Alvin’s statements to Officer Baker, Roland, and Hardin, if believed,
could create a reasonable doubt as to Eby’s guilt. Thus, the trial court acted outside the zone of
reasonable disagreement when it excluded the statements in question.
Motive In his fourth issue, Eby argues the trial court erred by admitting testimony regarding
Cervera’s life insurance policy to establish a motive for Cervera’s murder. Eby maintains that
without proof he knew his wife was a beneficiary under the policy, such evidence was irrelevant and
inadmissible against him.
            Evidence showing an accused’s motive to murder is admissible as relevant evidence.
Miranda v. State, 813 S.W.2d 724, 733 (Tex. App.—San Antonio 1991, pet. ref’d). However, such
evidence is admissible only if accompanied by proof showing that, at the time of the murder, the
accused had knowledge of the facts constituting the motive. Jernigan v. State, 585 S.W.2d 701, 704
(Tex. Crim. App. 1979); Winn v. State, 937 S.W.2d 124, 128 (Tex. App.—Amarillo 1996, no pet.).
Thus, “facts unknown to the accused cannot be proven to show motive for a killing, and that proof
of facts not directly or circumstantially shown to be known to the accused at the time of the homicide
is not admissible against him to show motive on his part.” Winn, 937 S.W.2d at 128. 
            Here, while Eby was testifying, the prosecution was permitted, over defense counsel’s
objection, to develop testimony regarding Cervera’s life insurance policy.
Q. And when did you find out Debra was still a beneficiary on [Cervera’s] life
insurance?
A.It was well after the fact. After he was — after he was found.
 
Defense Counsel: Judge, we’re going to object to the relevance of this
line of questioning.
 
The Court: Overruled.
 
Q.Well, after the fact. After [Cervera] was murdered you found out that she
was still a beneficiary on his life insurance?
A.I found out about a year later.
 
Q.A year later. And how much did you all collect on him?
A.I have no — 
 
Defense Counsel: Your Honor, we’re going to object to all of this line of
questioning. May we approach, Your Honor? (At the
bench)
 
Defense Counsel: Judge, this is the exact evidence that the Court has
indicated was entirely inadmissible without showing
that he knew. And now she has stated as an absolute
fact that they did collect insurance, and is going into
the amount of insurance, in total violation of the
motion in limine that this Court has already entered. 
And we move for a mistrial on this basis, that the
prosecution has injected before this jury evidence of
motive that this Court had heretofore excluded. And
we object that it is highly prejudicial, violation of the
limine, and the State was specifically instructed not to
go into any of that without laying the proper predicate. 
They have laid no predicate whatsoever, and they
have now injected it before this jury, both the affair
and the insurance.
 
The Court:Overruled. (End of bench discussion).
 
Q.How much did you collect on the insurance?
A.I don’t recall.
 
QYou don’t recall?
A.No, I do not, ma’am.
 
Q.Well, isn’t it true that it was over $300,000?
A.I never saw that amount of money in my life, ma’am.
 
Q.Okay. And, in fact, you actually shortly after the murder filed for bankruptcy;
isn’t it true?
 
                        Defense Counsel:       Object to relevance.
 
Prosecution: Judge, it goes to financial motive.
 
Defense Counsel: Again, Your Honor, this is exactly why we are making
this objection, is that she is attempting to put before
this jury a motive unknown to the defendant.
 
The Court: Overruled. Overruled.
 
Q.Isn’t it true that you filed for bankruptcy shortly after this murder occurred?
A.Yes. In October of 1998.
 
Q.In October of 1998. When did you all collect on the insurance?
A.We didn’t get it until sometime in ‘99, after — well after April. It was after
the arrest of Lindblom.
 
Q.After the arrest of Lindblom— 
A.Yes.
 
Q.— that’s when you got it? And were you aware that [Cervera] continued to
carry Debra on his health insurance as a spouse?
 
Defense Counsel: I’m going to object. That calls for hearsay, Judge.
There’s no evidence before this jury. Object, it calls
for hearsay.
 
Prosecution: If he knew, Judge. I’m asking if he knew.
 
Defense Counsel: It assumes a fact — 
 
The Court: Overruled.
 
Defense Counsel: Well, Judge, we’re going to have running line of
objections so I don’t have to object to every line of
question where this prosecutor is phrasing the
question that assumes a fact not in evidence, which
they have not put any evidence before this jury
through any witness. It’s calling — 
 
                        The Court:                  The specific question, you[r] specific question
objection as to that question is overruled. Let’s move
on.
 
            Q.        Do you know?
            A.        No, I don’t.
 
Q.Would it surprise you to know that the human resources person was under the
impression that they were still married — 
 
Defense Counsel: I object. It calls for speculation.
 
The Court: Sustained as to that question.
 
Defense Counsel: Be instructed to — Ask the jury be instructed to
disregard the statements of counsel in terms of what
the person was surprised or otherwise surprised as far
as her statement.
 
The Court: Ladies and gentlemen, please remember what the
attorneys say in this case is not evidence. You may
proceed.
 
Q.Were you — 
 
Defense Counsel: And we also move for a mistrial in that regard, Judge.
 
The Court: Denied.
Before cross-examining Debra, the prosecution informed the trial court that it intended to ask Debra
all the same things it had asked Eby. Defense counsel objected as follows:
And we have the same objection that we did to the defendant’s statements. That I
object — the record is clear what I’m objecting to, to anything about insurance,
anything about this affair. There’s no way to connect it to the defendant. The State
is aware that they have no witness that could show the defendant knew. And we
object to the Court allowing any questioning, even do you know or have you heard,
because of the injection of this material before the State — before this jury as a
matter of fact, and that’s the way the questions are being presented, which is clear
from the way she questioned the defendant, did you know that the family was in
shock, that assumes a fact, and did you know about the insurance.
 
                        The Court:                  I believe I sustained your objection to that question.
 
                        Defense Counsel:       That particular one, but the whole line of questioning Judge,
is what we’re objecting to.
 
                        The Court:                  Unless I know specifically what the question is and
specifically what the objection is, I can’t rule. So go ahead.
 
The prosecution proceeded to cross-examine Debra as follows:
Q.Ma’am, you were listed as a beneficiary on [Cervera’s] life insurance, weren’t
you?
A.I had no idea until the insurance contacted me.
 
Q.They contacted you?
A.Yes, ma’am.
 
Q.So you did not contact them two weeks after the murder and ask them when
you were receiving your money?
A.No, ma’am, I did not.
 
Q.Okay. And were you still listed as a spouse on [Cervera’s] health insurance,
weren’t you?
 
Defense Counsel: Same objection, Judge. It calls for hearsay and
assumes matters not in evidence.
 
Prosecution: If she knows, Judge.
 
The Court: She can answer if she knows.
The Witness: Could you repeat the question, ma’am?
 
Q.Were you listed as a spouse on [Cervera’s] health insurance?
A.I’m not — I don’t know.
 
Q.You don’t know — 
A.No, ma’am.
 
Q.— that he was still carrying you and Timothy?
 
Defense Counsel: Same objection. She’s testifying as if this is a
fact, Judge. There’s no evidence before the
jury, now she’s arguing with her.
 
The Court: Let’s move on.
 
Defense Counsel: Objection to her statements, Your Honor.
 
The Court: Sustained. Let’s move on.
 
***
Q.How much money did you collect on the life insurance of Roland Cervera?
A.I don’t recall off the top of my head the exact amount, because [Cervera] — 
 
Q.Was it over a hundred thousand?
A.No, ma’am.
 
Q.How much was it?
A.It was 30 or $40,000, ma’am.

***
Q. Okay. And Roland also had accidental death insurance, didn’t he?
A.I don’t know ma’am.
 
Q.You don’t know. Well, you collected it.
A.I just got what the insurance sent, ma’am.
            In the underlying proceeding, the State wholly failed to present any evidence, direct or
circumstantial, that Eby had any knowledge that his wife was a beneficiary under Cervera’s life
insurance policy. Without such evidence, the insurance motive evidence was irrelevant and should
have been excluded from the consideration of the jury by the trial court. See Jernigan, 585 S.W.2d
at 704 (holding evidence of a wife’s extramarital relationship was not admissible to show motive
because it was never established that the defendant-husband was aware of the relationship); Winn,
937 S.W.2d at 128 (holding evidence concerning victims’ trust account was not admissible to show
motive because the State never demonstrated the defendant had any knowledge that he was a
beneficiary of the trust). Upon another trial, however, the State should be given the opportunity to
prove, if it can, that Eby had knowledge his wife was a beneficiary under Cervera’s life insurance
policy at the time of the murder. 
 
Improper Cross Examination QuestionsIn his fifth issue, Eby argues the trial court erred by allowing the prosecution to cross-examine him about a possible affair between Debra and Cervera.


 A defendant who exercises his
right to testify is subject to the same rules governing examination and cross-examination as any other
witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial.
Felder v. State, 848 S.W.2d 85, 99 (Tex. Crim. App. 1992). The scope of cross-examination of a
defendant is wide open. Id. Once the defendant testifies at trial, he opens himself up to questioning
by the prosecutor on any subject matter that is relevant. Id. However, “the prosecution cannot
attempt to establish a theory of [the defendant’s] actions by questions alone, with no basis in fact. 
Nor may the prosecution attempt to get before the jury, indirectly through [its] cross-examination,
evidence in which the subject matter is inadmissible.” Hartman v. State, 507 S.W.2d 553, 556 (Tex.
Crim. App. 1974). 
            In the instant case, the State’s line of questioning was irrelevant because the State failed to
introduce any direct or circumstantial evidence that Eby had any knowledge of an affair between his
wife and Cervera. Therefore, it was improper for the State to explore the marital affair subject when
it had no basis in fact for the inquiry. Once again, however, the State should be given the
opportunity at the new trial to show, if it can, any relationship between Eby, Debra, and Cervera
which would shed light on Eby’s motives and intent to kill Cervera.
 

Conclusion
            Based on the foregoing, the judgment of the trial court is reversed and the cause is remanded
for further proceedings consistent with this opinion.
 
Catherine Stone, Justice

Publish