ACCEPTED
03-15-00247-CR
7548653
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/26/2015 10:31:31 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00247-CR**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/26/2015 9:21:31 AM
JEFFREY D. KYLE
Clerk

**COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS**
_____

**Trial Court Cause Number
CR2014-090**
_____

**KAYLA LARDIERI**

**VS.**

**THE STATE OF TEXAS**
_____

**APPEAL FROM THE 433rd DISTRICT COURT
COMAL COUNTY, TEXAS**
_____

**BRIEF FOR THE STATE-APPELLEE**
_____

**ORAL ARGUMENT
REQUESTED**

**CHARI L. KELLY**
**Texas Bar. No. 24057939**
**Comal County Criminal**
**District Attorney's Office**
**150 N. Seguin Ave., Suite 307**
**New Braunfels, Texas 78130**
**kellyc@co.comal.tx.us**
**(830) 221-1300**
**(830) 608-2008 (facsimile)**

**Attorney for State-Appellee**

# IDENTITY OF PARTIES AND COUNSEL

**Trial Judge:** The Honorable Dib W. Waldrip
District Judge of the 433rd District Court of
Comal County

**State – Appellee:** State of Texas

**Trial Counsel and**
**Appellate Counsel:** Chari L. Kelly
Comal County Criminal
District Attorney's Office
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130

**Appellate Counsel:** Joshua D. Presley
Comal County Criminal
District Attorney's Office
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130

**Defendant – Appellant:** Kayla Lardieri

**Trial Counsel and**
**Appellate Counsel:** Paul A. Finley
401 Main Plaza, Suite 200
New Braunfels, Texas 78130

# TABLE OF CONTENTS

IDENTITIES OF INTERESTED PARTIES ........................................................ ii

TABLE OF CONTENTS ................................................................................ iii

TABLE OF AUTHORITIES ......................................................................... iv

STATEMENT OF THE CASE ........................................................................1

ISSUES PRESENTED .................................................................................. 2

STATEMENT OF FACTS .............................................................................3

SUMMARY OF THE ARGUMENT .........................................................13

*Legal Sufficiency Standard of Review* ....................................................14

ARGUMENT ...............................................................................................18

    I. THE EVIDENCE – INCLUDING THE TESTIMONY OF THE VICTIM, CO-DEFENDANTS, AND THE DEFENDANT'S OWN ADMISSIONS – IS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR ATTEMPTED CAPITAL MURDER ........................................................18

    II. THE EVIDENCE WAS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR AGGRAVATED ROBBERY .....................................23

    III. THE EVIDENCE WAS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE ............................26

PRAYER .....................................................................................................28

CERTIFICATE OF SERVICE ...................................................................29

CERTIFICATE OF COMPLIANCE ..........................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page No.**

*Amaya v. State*, 733 S.W.2d 168 (Tex. Crim. App. 1986) ......................................................................................21

*Anderson v. State,* No. 14-00-00810-CR, 2001 WL 1426676 (Tex. App.—Houston [14th Dist.] Nov. 15, 2001, pet. ref'd) (not designated for publication)..............................................................24, 25

*Brown v. State*, 649 S.W.2d 160 (Tex. App.—Austin 1983, no pet.)..................................................................17

*Cortez v. State*, 08-02-00363-CR, 2004 WL 178587 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (not designated for publication) ......................................................................................15

*Escobar v. State*, 28 S.W.3d 767 (Tex. App.—Corpus Christi 2000, pet. ref'd) ........................................24, 25

*Ford v. State*, 09-02-050CR, 2004 WL 742720 (Tex. App.—Beaumont Apr. 7, 2004, no pet.) (mem. op., not designated for publication)..............................................................................19

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................*passim*

*Kiffe v. State*, 361 S.W.3d 104 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ........................................................ *passim*

*Lane v. State*, 174 S.W.3d 376 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)..................................................................15

*Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009) ...................................................................16

*Margraves v. State*, 34 S.W.3d 912 (Tex. Crim. App. 2000), abrogated on other grounds by *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009)...................................16, 22, 25

*Miranda v. State*, 813 S.W.2d 724 (Tex. App.—San Antonio 1991, pet. ref'd) ................................................*passim*

*Moore v. State*, 969 S.W.2d 4 (Tex. Crim. App. 1998)...........................................................................19

*Roberson v. State*, 16 S.W.3d 156 (Tex. App.—Austin 2000, pet. ref'd)..................................................16

*Rockwell v. State*, AP-76,737, 2013 WL 6529575 (Tex. Crim. App. Dec. 11, 2013) (not designated for publication) .......................................15, 16

## Statutes and Other Authority           Page No.

Tex. Penal Code §19.03 (Attempted Capital Murder) .................................................................1

Tex. Penal Code §20.04 (Aggravated Kidnapping) ...................................................................1

Tex. Penal Code §22.021 (Aggravated Sexual Assault) ............................................................1

Tex. Penal Code §29.03 (Aggravated Robbery) ......................................................................1

Tex. Penal Code §37.09 (Tampering With Evidence) ...............................................................1

## STATEMENT OF THE CASE

Appellant was indicted by the Grand Jury in a multiple count indictment of Attempted Capital Murder, Aggravated Kidnapping, Aggravated Sexual Assault, Aggravated Robbery, and Tampering with Evidence. Tex. Pen. Code §§ 19.03 20.04, 22.021, 29.03, and 37.09. R.R. Vol. 3, pp. 29-34.

Following a jury trial, on February 7, 2015, the Appellant was found guilty of Attempted Capital Murder, Aggravated Kidnapping, Aggravated Robbery, and Tampering with Evidence and acquitted of Aggravated Sexual Assault. R.R. Vol. 7, p. 58. Appellant elected the judge to assess punishment, which occurred on February 10, 2015 after both sides presented testimony. *See generally id.* at 61-69 and R.R. Vol. 8, p. 7-118. Appellant was sentenced to thirty (30) years' incarceration in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) for Counts I, II and IV and ten (10) years' incarceration in TDCJ for Count V to be served concurrently. *Id.* at 124-25.

The Appellant timely filed her Notice of Appeal.

# ISSUES PRESENTED

1. Can an Appellant raise a sufficiency of the evidence claim for Attempted Capital Murder on appeal when the victim, and Appellant herself, testified that Appellant punched, kicked, tased, stabbed, handcuffed, hogtied and left the naked victim locked in a shed on one the coldest nights of the year?

2. Can an Appellant raise a sufficiency of the evidence claim for Aggravated Robbery on appeal when the victim testified that Appellant, and her co-defendants, cut off her necklace with a knife and took away all her belongings, including her clothes, leaving her naked?

3. Can an Appellant raise a sufficiency of the evidence claim for Tampering with Evidence when Appellant admitted during trial that she helped carry all of the items from the attempted murder from the scene of the crime and accompanied Mr. Smith after "Big Mike" told him to dispose of the items?

**STATEMENT OF FACTS**

On the morning of December 9, 2013, a Canyon Lake woman, Mariah Denman, found a frantic, naked and bleeding woman in the front seat of Ms. Denman's car. R.R. Vol. 3, p. 130. The woman begged Ms. Denman not to call 911, because she was afraid that if Ms. Denman called "they would kill her." *Id.* The woman's ankles were handcuffed tightly with hinged handcuffs, and she indicated that she had escaped from the house across the street, "Big Mike's house." *Id.* at 130-31.

Ms. Denam called 911, and EMS and the Comal County Sheriff's officers reported to the scene. R.R. Vol. 3, pp. 130-31. Deputy Adrianna DeLeon was able to identify the injured woman as Dana Huth, and testified that she was naked, covered in blood and dirt and "looked like a corpse, like the walking dead." R.R. Vol. 3, pp. 148, 153. She described Ms. Huth as being terrified and in pain. *Id.* at 148. Deputy DeLeon removed and collected the leg shackles from Ms. Huth, as well as a gag and eye mask from Ms. Huth's neck for evidence. *Id.* at 147, 149; State's Exhibit 64. Deputy DeLeon photographed Ms. Huth's extensive injuries at Christus Santa Rosa Hospital, State's Exhibits 10-27, and identified a partial letter "K" carved into Ms. Huth's back. R.R. Vol. 3 p. 159.

Ms. Huth immediately identified her attackers to law enforcement: the Appellant, and her co-defendants Heather Richards, Sheena Hopkins, Trace Smith,

and Mike Chapin. *See* State's Exhibits 69-71. At trial, she testified that she was knew Appellant because Appellant was dating Trace Smith, a longtime friend. R.R. Vol. 3, p. 51. On the evening of December 8, 2013 Ms. Huth went to Mike Chapin's, aka "Big Mike's," mobile home to introduce a friend, Mr. Barkley, to "Big Mike." R.R. Vol. 3, pp. 53-4. Ms. Huth brought her backpack with her, which contained a metal-framed wallet, her pay stubs, a computer and other items. *Id*. at 58-60, 73, and 92. *See* State's Exhibits 1, 252, and 254. After she arrived, Appellant and Trace Smith came over, shortly followed by Heather Richards and Sheena Hopkins. *Id*. at 54. Ms. Huth testified that the "girls," Appellant, Ms. Richards and Ms. Hopkins met outside on the porch for 15 to 20 minutes before walking straight into the back bedroom of the Big Mike's house. *Id*. at 56. Clint Barkley also testified that while the women were on the front porch, he could hear a taser being "popped off" outside. *Id*. at 142. Ms. Huth was asked to join to "the girls" in the back bedroom by "Big Mike." *Id*. at 57.

When Ms. Huth entered the back bedroom, Ms. Richards confronted Ms. Huth about her relationship with a man named Travis Nealon or "T-Bone."[1] *Id*. at 51, 61. Ms. Richards starting yelling and screaming at Ms. Huth, when Appellant started joining in the initial verbal attack. *Id*. at 61. Appellant called Ms. Huth a "bitch informant," accusing her of cloning Appellant's phone and wearing a wire.

---

[1] Ms. Huth was "seeing" T-Bone and testified that T-Bone lied to her, as he did not reveal that he already had a girlfriend, Ms. Richards. *Id*. at 61.

4

*Id.* Ms. Huth was made to remove her clothes, and ordered to lay down on the bed while Appellant checked Ms. Huth's vagina for a wire. *Id.* at 63. Ms. Richards then cut off a diamond teardrop necklace Ms. Huth was wearing off with a knife. *Id.* Ms. Huth asked for her backpack and phone, and while these items were initally brought into the back bedroom, these items were removed and not returned to Ms. Huth. R.R. Vol. 3, p. 73 and R.R. Vol. 5, p. 40, 43-4. Ms. Richards started tasing Ms. Huth, and both Appellant and Ms. Richards stabbed Ms. Huth. R.R. Vol. 3, p. 64. Ms. Huth testified that Appellant "stabbed me in my left thigh very deeply, and I started bleeding profusely." *Id.* at 64-65. She testified that Ms. Richards and Appellant were "calling me a bitch and a whore and an informant, and saying 'I'm getting what I deserve'" during the attack. *Id.* at 65. Ms. Huth also had to shield her face from the Appellant who was "coming at her" with a knife. *Id.* at 67. Additionally, Willy James testified that he saw Appellant stabbing Ms. Huth on a video that Travis or "T-bone" showed him after the assault. *Id.* at 136, 138. Ms. Huth testified that she had eight stab wounds. *Id.* and State's Exhibit 257. Appellant was very "hostile" during the assault and the most aggressive of all of her attackers. *Id.* at 68.

Appellant and Ms. Richards kicked Ms. Huth in the side of the head and her ribs repeatedly until Ms. Huth eventually passed out as they were handcuffing and shackling her. *Id.* at 69. Ms. Huth testified that they put a tennis ball gag in her

5

mouth, an eye mask across her eyes, and electrical tape around her hands. *Id*. at 71 State's Exhibits 67, 247- 248. Ms. Huth was "hogtied" with her hands and legs tied behind her and medieval type shackles and multiple pairs of handcuffs. *Id*. at 72 and State's Exhibits 68 and 249.

After Ms. Huth was blindfolded, handcuffed, and hogtied, she was thrown on the bed and wrapped in a sheet. *Id*. at 72. She was carried from the mobile home outside and locked into a shed. *Id*. at 73. In the shed, Ms. Huth was able to free her hands from the handcuffs, escaped from a window, and then crawled, naked and still shackled at the ankles, to a neighbor's car where she hid until morning. *Id*. at 74-80. As Ms. Huth hid in the car, she heard her attackers return, specifically a female voice saying "Oh fuck. She's not here, she's gone." *Id*. at 82.

Ms. Huth was hospitalized and required a month and a half of therapy to recover from her injuries. *Id*. at 86 and State's Exhibit 257. She could not walk for two weeks and then used a walker and cane. *Id*. at 89. Ms. Huth suffered "flutters" in her vision, memory loss, and displayed scars to the back of her neck, her right hand, left hip, and left side of her stomach to the jury. *Id*. at 87-90.

Ms. Huth's belongings: her necklace, a backpack, wallet, laptop, phone, and her clothes were never returned. *Id*. at 73, 92-3 and R.R. Vol. 4, p. 180. Ms. Huth testified that she was "in fear for her life" not only in the back bedroom but in the

shed where was she was left to die. R.R. Vol. 3 p. 91-2. She felt that they "might kill" her. *Id*. at 93.

Treating EMT Adrienne Pierce testified that on scene Ms. Huth was very cold, her blood pressure was very low and required an IV to replenish her fluids. *Id*. at 194. Ms. Huth was screaming, in distress, and in a lot of pain. *Id*. at 192.

Det. Brian Morgan, the lead detective in the case, testified regarding most of the physical items that were recovered from the scene, including multiple pairs of bloodied handcuffs, bloodied shackles, a bloodied ball gag, and bloodied sheets found inside of the locked shed at "Big Mike's" house. R.R. Vol. 4, p. 101-03 and State's Exhibits 212-227 [photographs], 244-249 [physical evidence]. Det. Morgan also performed a video walkthrough of the scene and documented blood in the back bedroom on the mattress, box spring, wall, door, and a nearby safe. *Id*. at 96-100 State's Exhibits 148 [video], 184-192 [photographs], 241, and 244-49 [physical evidence].

Det. Morgan also searched Mr. Stovall's burn pit and recovered the charred remains of a metal framed wallet, an iPhone, other cell phone parts, a dog chain, fabric, and a small piece of one of Ms. Huth's pay stubs. *Id*. at 114-18 and State's Exhibits 251-256.

Det. Morgan also testified that the evening of the assault was the coldest night of the year for the area, with a low temperature of 25 degrees Fahrenheit. *Id*.

at 82-4 and State's Exhibit 147. He testified that the distance Ms. Huth crawled naked and handcuffed, based on the blood trail found at the scene, was 216 feet. *Id*. at 93 and State's Exhibit 239.

Co-defendant Sheena Hopkins confirmed many of the details relayed by Ms. Huth. *See generally* R.R. Vol. 4, p. 158-88. She testified that Appellant was in contact with Ms. Richards via text the day of the assault, and alerted Ms. Richards of Ms. Huth's whereabouts. R.R. Vol. 4, p. 166. Ms. Hopkins testified that Ms. Richards took Ms. Huth's phone away from her before tasing Ms. Huth. *Id*. at 168-9. Ms. Hopkins further relayed that Appellant accused Ms. Huth of "putting an app" on her phone and Kayla stabbed Ms. Huth in the leg and on her right hip with a small butcher's knife. *Id*. at 170, 173-4. Ms. Hopkins testified that Appellant kicked Ms. Huth, "stomped on her," spit on her, and called Ms. Huth names like "bitch" and "dope whore." *Id*. at 172. Appellant told Ms. Huth to "shut up" when she tried to scream. *Id*. at 173. Both Appellant and Ms. Richards stopped Ms. Huth from leaving the room during the assault. *Id*. at 173. At one point Mr. Smith entered the back bedroom and pointed a 12 gauge shotgun at Ms. Huth and told her to "shut the fuck up." R.R. Vol. 5, p 23. Ms. Huth was bleeding more than Ms. Hopkins "had ever seen in her life." R.R. Vol. 4, p. 173. After the women helped handcuff and hogtie Ms. Huth, Appellant, Ms. Richards, and Mr. Smith carried Ms. Huth to a shed and locked her inside. *Id*. at 174-178. Ms.

8

Hopkins testified that Appellant acted like she was enjoying the assault, "like she was having fun, like it didn't bother her." *Id.* at 177. Ms. Hopkins thought Ms. Huth would die in the shed "because she was bleeding so bad and it was so cold." *Id.* at 178. Appellant told Mr. Smith that Ms. Huth was "bleeding out." R.R. Vol. 5, p. 26. "Big Mike" suggested that they disposed of Ms. Huth's body at a pig farm because, as Mr. Smith explained at trial, "pigs will eat just about anything." *Id.*

After Ms. Huth was locked in the shed, Appellant, Ms. Richards, Ms. Hopkins and Mr. Smith gathered everything from the back bedroom, including Ms. Huth's backpack, and took it to Ms. Richard's house. R.R. Vol. 4, p. 180 and R.R. Vol. 5, p. 42. Mr. Smith testified that he was "told that [he] needed to get rid of it and dispose of it" by "Big Mike." R.R. Vol. 5, p. 29. Mr. Smith and Appellant went to Jerry Stovall's house, without the co-defendants, and Mr. Smith burned Appellant's clothes, Ms. Huth's backpack, her wallet, her Bible, her phone, and Ms. Huth's necklace. *Id.* at 30, 35-36. Mr. Smith testified that he burned it to "dispose of evidence." *Id.* at 36, 52-3. He told Appellant that he would burn her clothes, and Appellant knew that he was burning Appellant's clothes. *Id.* at 49-50, 53. Later, Mr. Smith told Det. Morgan that he didn't know that Kayla and the others were "going to leave the bitch for dead and put all of our fucking lives at risk." *Id.* at 51.

Amanda Chavira – a cellmate of Appellant in the Comal County jail – testified that not only did Appellant acknowledge that she tried to kill Ms. Huth, she "bragged" about it. *See generally* R.R. Vol. 5, p. 69-77. Ms. Chavira testified Appellant admitted to stabbing Ms. Huth in the leg, side, and back of her neck:

> She said that she grabbed that bitch's fucking head, slammed it over here on her knee. And when she cut it open, that she was going to try to cut her fucking head off. And when it came out, it looked coagulated and so cool that she wanted to play with it.
>
> . . .
>
> Q. What was her demeanor like when she was telling you about all of this?
>
> A. She was -- it was disgusting, the look in her eyes, like she was smiling, happy, like she was getting off on it. She -- every time she would talk about it, I mean, she was just so happy and just like a kid would talk about, you know, winning some trophy. But to her it -- it was disgusting.

R.R. Vol. 5, p. 73-4. Ms. Chavira further testified that when Appellant left Ms. Huth in the shed, Appellant thought she was dead.[2] *Id.* at 75.

Appellant waived her Fifth Amendment rights and took the stand in her own defense. *See generally* R.R. Vol. 6, pp. 8-133. Appellant testified that she

---

[2]

> Q. What, if anything, did the defendant say about what she thought when they put [Ms. Huth] in the shed?
> A. Thought that bitch was fucking dead.
> Q. Is that what she wanted?
> A. Uh-huh.
> Q. You have to answer.
> A. Yes. That's what she wanted.

R.R. Vol. 5, p. 75

10

believed that Ms. Huth had taken her phone on multiple occasions and put a virus and "app" on her phone, which caused it to malfunction. *Id*. at 22-24. Additionally, Appellant testified that Ms. Huth was a "snitch" and an informant as she was recording several drug deals, including Appellant and Mr. Smith. *Id*. at 25, 39, 75-76. Appellant testified that she had a knife with her that evening because "Mike is a collector of weapons. And [Smith] and I decided we were going to kind of start our own little collection." *Id*. at 43. Appellant admitted that she brandished the knife against Ms. Huth and while she acted like she was going to stab Ms. Huth, the victim "ran into her knife." *Id*. at 45, 88-9 and State's Exhibit 124. Appellant stated she "felt the puncture of [Ms. Huth's] flesh." *Id*. at 45, 88. After that, Appellant decided to use the taser and tased Ms. Huth between seven to ten times. *Id*. at 47, 90-1. As she was tasing Ms. Huth she noticed that the stab wound she made was "bleeding fairly—a lot" and she noticed other stab wounds. *Id*. Appellant also admitted that she kicked Ms. Huth, but that it "was more of a reflex than anything." *Id*. at 49, 89-90. She testified that she watched as Ms. Richards stabbed, punched, and kicked Ms. Huth. *Id*. at 47-51. Appellant testified that she noticed that Ms. Huth wasn't breathing very well. *Id*. at 52. Appellant testified that Ms. Richards told Appellant that she thought that Ms. Huth would die, and they should dispose of her body in a fire pit in Blanco, Texas. *Id*. at 53, 55, 94. At that point, Appellant admitted that she helped shackle Ms. Huth,

11

wrap her in a sheet, and carried her to the shed. *Id*. at 57, 97-98, 106. Appellant also testified that she helped carry all of the items from the back room, which were wrapped in a sheet, to Ms. Richard's car, before departing the scene with Ms. Richards, Ms. Hopkins, and Mr. Smith. *Id*. 57-59, 106-07.

Appellant never checked on Ms. Huth, despite the fact that she heard the victim moaning in the locked shed. *Id*. at 65, 108. Appellant never assisted Ms. Huth or considered calling the police, an ambulance, or someone to Ms. Huth's aid that night because she "didn't want to get in trouble." *Id*. at 125-26.

**SUMMARY OF THE ARGUMENT**

In her first point of error, Appellant argues that the evidence was not factually sufficient to support her conviction of Attempted Capital Murder as there was no testimony during the trial that any one of the co-defendants intended to kill Ms. Huth. However, Ms. Huth's testimony was unequivocal – the Appellant was her most aggressive attacker, and she expected to die at the hands of the Appellant and her co-defendants. During Appellant's own testimony, she admits to kicking stabbing, and tasing the victim, as well as discussing what should be done with her body, and finally, helping to carry her naked body to a shed to a shed on one of the coldest nights of the year. In accordance with *Kiffe*, deference is to be given to the jury's evaluation of the credibility and weight of the evidence, and Appellant's point of error one should be overruled.

In her second point of error, Appellant argues that the evidence was not factually sufficient to support her conviction of Aggravated Robbery as Appellant testified that she didn't "intend to rob" Ms. Huth and didn't "intend to put any of the [victim's] items in a bed sheet" that was carried from the scene. However, testimony was presented at trial that Appellant was present when Ms. Huth's necklace was removed by cutting it from her neck, and all of her clothes and belongings were removed and never returned during the course of a vicious assault

13

during which Appellant brandished a knife. Appellant's point of error two should be overruled.

In her third point of error, Appellant argues that the evidence was not factually sufficient to support her conviction of Tampering with Evidence as there was no evidence at trial that Appellant "directly altered, destroyed or concealed evidence." However, this argument ignores Appellant's own testimony wherein she admits that she assisted in removing items from the crime scene, removed her own blood soaked clothing, and "did not want to get in trouble." Appellant's point of error three should be overruled.

### *Legal Sufficiency Standard of Review*

After the decision of the Court of Criminal Appeals in *Brooks v. State*, Texas appellate courts review legal and factual sufficiency challenges in criminal cases using the same legal sufficiency standard of review. *Kiffe v. State*, 361 S.W.3d 104, 107 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Ervin v. State,* 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)). Evidence is only insufficient if, when considering all the evidence in the light most favorable to the verdict, "no rational factfinder could have found each essential element of the

14

charged offense beyond a reasonable doubt." *Id.*[3] (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Courts will treat direct and circumstantial evidence equally. *Kiffe*, 361 S.W.3d at 108. "[D]irect evidence of a fact, standing alone and if believed by the jury, is always… sufficient to prove that fact." *Cortez v. State*, 08-02-00363-CR, 2004 WL 178587, at *3 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (not designated for publication) (citing *Goodman v. State*, 66 S.W.3d 283, 286 (Tex. Crim. App. 2001)); *see also Lane v. State*, 174 S.W.3d 376, 386 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (testimony of a child victim, standing alone, is sufficient to support aggravated sexual assault conviction). Furthermore, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Rockwell v. State*, AP-76,737, 2013 WL 6529575, at *1 (Tex. Crim. App. Dec. 11, 2013) (not designated for publication) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)), *cert. denied,* 134 S. Ct. 2724 (2014).

Legal sufficiency review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

---

[3] When viewing the evidence in the light most favorable to the verdict, evidence can be insufficient in two circumstances: when the record contains "no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" **or** when "the evidence conclusively establishes a reasonable doubt." *Id*. The evidence may also be insufficient when the acts alleged do not constitute the offense charged. *Id*. at 108.

Each fact in isolation need not establish the guilt of the accused. *Roberson v. State*, 16 S.W.3d 156, 164 (Tex. App.—Austin 2000, pet. ref'd). Reviewing courts will determine whether the necessary inferences are reasonable based on the "combined and cumulative force of the evidence when viewed in the light most favorable to the verdict." *Kiffe*, 361 S.W.3d at 108. Appellate courts will presume that the factfinder "resolved any conflicting inferences in favor of the verdict" and defer to that resolution. *Id*. The reviewing courts will also defer to "the factfinder's evaluation of the credibility and the weight of the evidence." *Id*. The factfinder is entitled to accept some testimony and reject other testimony, in whole or in part. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), abrogated on other grounds by *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *see also Roberson*, 16 S.W.3d at 164 (factfinder may accept or reject any or all evidence presented by either party).

When examining party liability, as the *Rockwell* Court observed:

A reviewing court may look to "events before, during, and after the commission of the offense" to determine whether an individual is a party to an offense, and it may rely on circumstantial evidence to prove party status. Although each fact "need not point directly and independently to the guilt of the appellant," the cumulative effect of the incriminating facts must be sufficient to support the conviction.

2013 WL 6529575 at *2 (citing *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). "Evidence is sufficient to convict a defendant under the law of parties when he or

she is physically present at the commission of the offense and encourages the commission of the offense either by words or other agreement." *Miranda v. State*, 813 S.W.2d 724, 732 (Tex. App.—San Antonio 1991, pet. ref'd). "While an agreement of the parties to act together in common design seldom can be proved by direct evidence, reliance can be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act." *Id.*

Ultimately, the reviewing court is not to determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original). Accordingly, "the verdict will be sustained if there is any evidence which, if believed, shows the guilt of the accused." *Brown v. State*, 649 S.W.2d 160, 163 (Tex. App.—Austin 1983, no pet.).

## ARGUMENT

I. **THE EVIDENCE – INCLUDING THE TESTIMONY OF THE VICTIM, CO-DEFENDANTS, AND THE DEFENDANT'S OWN ADMISSIONS – IS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR ATTEMPTED CAPITAL MURDER.**

Appellant argues in point of error one that the evidence was factually insufficient to support her conviction. *See* Appellant's Brief at 7-10. However, appellate courts now review evidence in criminal cases for legal sufficiency only. *Kiffe*, 361 S.W.3d at 107. The evidence is sufficient to uphold Appellant's conviction of Attempted Capital Murder. As detailed in the Statement of Facts, *supra* (at 3-12), the "combined and cumulative force of the evidence when viewed in the light most favorable to the verdict" was clearly sufficient for any rational jury to make the necessary inferences and conclude Appellant committed the offense of Attempted Capital Murder as a principal or as a party to the offense. *See Kiffe*, 361 S.W.3d at 108.

Notably, Appellant does not challenge the sufficiency of the evidence to support her conviction for Aggravated Kidnapping. Clearly Appellant was present at the scene of the offense. Although Appellant emphasizes elsewhere in her brief that her mere presence is insufficient (Brief for Appellant at 13, 17), "[w]hile mere presence alone is not in and of itself *sufficient* to sustain a conviction, it is a *factor* which may be considered in conjunction with other factors in determining the

18

sufficiency of the evidence to show that a defendant was a participant." *Miranda*, 813 S.W.2d at 733.

*Miranda* also observes that, when evaluating whether there was an agreement to commit an offense as a party, such agreement "must be before or contemporaneous with the criminal event." *Id.* at 732. In addition to the ample evidence that Appellant continued participating in the brutal assault and removal of the naked victim to the freezing shed, *supra* (at 3-12), there was testimony that *prior* to the attack, Appellant, Ms. Richards and Ms. Hopkins met on the porch for 15 to 20 minutes – during which time a taser could be heard 'popping off.' R.R. Vol. 3, pp. 56, 142. Appellant herself admitted to then bringing a knife with her and brandishing it during the attack. R.R. Vol. 6, pp. 43, 45, 88-89. Other evidence of Appellant's actions before, during and after the attack likewise reflect the agreement to kill the victim.[4]

"Proof of motive is admissible as a circumstance indicating guilt." *Id.* In the instant case, there was testimony that Appellant was screaming and yelling at the

---

[4] Appellant also takes issue with the lack of direct testimony of the various conspirators' intent, including her own. Brief for Appellant at 7, 9 ("the complainant herself never indicated she heard any discussion about the Co-Defendants intending to kill her"). However, just as "an agreement of the parties to act together in common design seldom can be proved by direct evidence" (*Miranda*, 813 S.W.2d at 732), mental states such as intent are fact issues which are typically established through circumstantial evidence and inferred from the defendant's acts, words and conduct. *See Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998); *Ford v. State*, 09-02-050CR, 2004 WL 742720, at *2 (Tex. App.—Beaumont Apr. 7, 2004, no pet.) (mem. op., not designated for publication).

victim, calling her "bitch informant" and accusing the victim of cloning Appellant's phone and wearing a wire. R.R. Vol. 3, p. 61. Appellant testified that the victim was a "snitch" and an informant who had recorded some of Appellant's drug deals. R.R. Vol. 6, pp. 25, 39, 75-76. Appellant had a strong and expressed motive to kill the victim.

The brutal assault included eight stab wounds to the victim. R.R. Vol. 3, pp. 64-67, 136, 138; State's Exhibit 257. Appellant stabbed her knife deep into the victim's thigh, causing her to bleed profusely. *Id*. at 64-64. Notably, as *Miranda* observed, an "appellant's actions after the commission of the alleged offense are also factors indicative of guilt …. [t]he making of contradictory or false statements concerning the facts have been held to be inculpatory evidence." 813 S.W.2d at 733. On the stand, Appellant ludicrously claimed she merely acted like she was going to stab the victim, and the victim "ran into [Appellant's] knife." R.R. Vol. 6, pp. 45, 88-89. Her ridiculous assertion that it was an 'accidental' stabbing is belied by her admission to subsequently tasing the victim seven to ten times and kicking the victim, despite the fact the victim was "bleeding fairly – a lot." *Id*. at 47, 49, 89-91. Appellant stopped the victim from leaving the room during the attack. R.R. Vol. 4, p. 173. The victim eventually passed out as Appellant was kicking her in the head and ribs. R.R. Vol. 3, p. 69. The jury plainly rejected Appellant's blatant

falsehoods and could consider the absurdly false statements as evidence of Appellant's guilt.

Furthermore, "[a]ttempts to suppress or fabricate evidence are admissible against a defendant." *Miranda*, 813 S.W.2d at 733. After the victim passed out, Appellant helped carry the naked and hog-tied woman to a freezing shed, locking her inside. R.R. Vol. 4, pp. 174-178. Appellant said at the time that the victim was "bleeding out." R.R. Vol. 5, p. 26. Appellant then helped gather the victim's belongings from the back bedroom and transport them to another house. *Id*. at 42; R.R. Vol. 4, p. 180. Hiding evidence – including the victim herself, whom the Appellant assumed would die cold, naked and bleeding out in the locked shed – is another action reflecting on Appellant's intent (and that of her co-conspirators).[5]

Whereas *Miranda* noted that prior statements "evidencing an interest in the victim's death are a circumstance indicating guilt" (813 S.W.2d at 733), in the

---

[5] Although there was sufficient evidence to convict Appellant as a party **or** as a principal, Appellant cites *Amaya* for the proposition that "[t]he Court has required a higher level of complicity for those denoted as parties" (Brief for Appellant at 9). The context of *Amaya* is vastly different. That case involved the lending of money in ways which contradicted the particular terms of a government grant. *Amaya v. State*, 733 S.W.2d 168, 171 (Tex. Crim. App. 1986). The State had not shown the appellants at issue, as parties, *knew they were committing an offense. See id*. at 174 (where the Court observed that a mistake of law might preclude liability for a party, stating "[w]e require a higher level of complicity from those we denote parties than those we denote primary actors, *because the former are performing acts that are not illegal in and of themselves*") (emphasis added). By contrast, in the instant case Appellant has not challenged her conviction for Aggravated Kidnapping, and the facts preclude any serious argument that Appellant didn't realize Attempted Capital Murder was an offense. *See* Statement of Facts, *supra* (at 3-12).

instant case, testimony established that Appellant later bragged she had tried to kill the victim – that at the time she cut the victim's neck, Appellant was "going to try to cut her fucking head off," in addition to several other knife wounds Appellant inflicted. R.R. Vol. 5, pp. 73-74; *see also* Vol. 9, pp. 296-300. Appellant's admission is much more striking than the appellant's expression in *Miranda* that "she wished [the victim] was dead." *Compare with* 813 S.W.2d at 733.

The foregoing – only some of the overwhelming evidence introduced against Appellant – is clearly more than a mere "modicum" of evidence. The jurors evaluated the weight and credibility of evidence and testimony from the victim, the co-conspirators and Appellant herself in finding Appellant guilty. Appellant relies on her own self-serving claims regarding her lack of knowledge or intent (Brief for Appellant at 7-9). However, the jury was free to accept some testimony and reject other testimony, in whole or in part, and the Court should defer to the jury's resolution of any conflicting inferences in the evidence in favor of the verdict. *See Kiffe*, 361 S.W.3d at 108; *Margraves*, 34 S.W.3d at 919; *Miranda*, 813 S.W.2d at 733-34 ("Reconciliation of evidentiary conflicts is solely a function of the trier of fact"). Because – when viewing the evidence in the light most favorable to the prosecution – it cannot be said that *no* rational fact finder would have found Appellant guilty, Appellant's first point of error should be overruled. *See Jackson*, 443 U.S. at 318-19.

## II. THE EVIDENCE WAS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR AGGRAVATED ROBBERY.

Appellant next claims the evidence was factually insufficient to support her conviction for Aggravated Robbery. Brief for Appellant at 11. As discussed *supra*, there is no more factual sufficiency of the evidence review in criminal cases. Appellant concedes a deadly weapon was used against the victim. *Id*. at 14. Again, Appellant's Aggravated Kidnapping conviction is not contested. Appellant and her cohorts repeatedly tried to silence the victim, restrained her with shackles, a blindfold and gag, and locked her in a shed. It was certainly foreseeable that the conspirators – in furtherance of the uncontested Aggravated Kidnapping – would also remove the victim's most obvious means of obtaining help: her cell phone.

The foregoing facts, and the argument related to the first point of error, are likewise applicable here. The totality of the evidence indicates an element of the conspiracy was to take the victim's property – including her phone – from the outset, particularly in light of the fact that Appellant thought the victim had recorded several of Appellant's drug deals. *See* R.R. Vol. 6, pp. 25, 39, 75-76. Testimony indicated Appellant's concern for such recordings was so extreme that it led her to check the victim's vagina for a wire. R.R. Vol. 3, p. 63.

Furthermore, even if there had not been sufficient evidence of an agreement *prior to* the criminal event, any agreement may also be "*contemporaneous* with the criminal event," and appellate courts may examine events occurring before, during,

or after the commission of the offense. *Miranda*, 813 S.W.2d at 732 (emphasis added). Texas courts have found the evidence legally sufficient to support party liability for aggravated robbery when that party learns of an element of the offense – the use of a deadly weapon – and continues to participate in the offense. *See Escobar v. State*, 28 S.W.3d 767, 774 (Tex. App.—Corpus Christi 2000, pet. ref'd) (holding that evidence was sufficient to support party liability for aggravated robbery because appellant got into the get-away car with stolen goods as the other party pointed a firearm at victim); *Anderson v. State,* No. 14-00-00810-CR, 2001 WL 1426676, at *2 (Tex. App.—Houston [14th Dist.] Nov. 15, 2001, pet. ref'd) (not designated for publication) (evidence was legally sufficient to support appellant's aggravated robbery conviction as a party when he continued to participate in the offense after observing his co-defendant pull out a gun and point it at the victim's head).

Appellant does not contest her conviction for Aggravated Kidnapping. She talked with her conspirators on the porch – while the group was armed with knives and a taser – prior to the attack. She attempted to remove any 'wires' from the victim. Appellant witnessed Ms. Richards cut off the victim's necklace during the assault and Appellant continued assaulting the victim with a deadly weapon. Appellant carried the victim away from the victim's property to lock her in a shed

24

before carrying the property itself to another location. *Compare with Escobar v. State*, 28 S.W.3d at 774; *Anderson*, 2001 WL 1426676 at *2.

Based on the totality of the circumstances, the jury could have reasonably inferred that Appellant by her actions knew of the aggravated robbery and intended to promote or assist the same. *See Escobar*, 28 S.W.3d at 774 ("In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution."). Notwithstanding Appellant's preferred testimony, the factfinder is free to accept or reject whatever testimony it chooses, in whole or in part. *See Margraves*, 34 S.W.3d at 919. Again, since it cannot be said that *no* rational fact finder would have found Appellant guilty when viewing the evidence in the light most favorable to the prosecution, Appellant's second point of error should be overruled. *See Jackson*, 443 U.S. at 318-19.

## III. THE EVIDENCE WAS SUFFICIENT TO UPHOLD APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE.

Finally, Appellant contends the evidence was factually insufficient to support her conviction for Tampering with Evidence.[6] Brief for Appellant at 15. To avoid undue repetition, the foregoing facts, arguments and circumstances surrounding the other offenses apply equally to the instant point of error. In addition to the fact that Appellant does not contest her conviction for Aggravated Kidnapping – and the facts and surrounding circumstances mentioned *supra* – other facts are particularly relevant to the sufficiency of the evidence for the Tampering conviction.

Appellant's actions during and after the attack evince her strong interest in concealing the assault. In addition to checking the victim for a wire, Appellant told the victim to "shut up" when she tried to scream. R.R. Vol. 4, p. 173. She later admitted she was trying to kill the victim, whom she thought was a snitch. She helped carry the naked, gagged and hog-tied woman to the freezing shed, expecting she would bleed out. Appellant then helped gather everything from the room to take it to Ms. Richard's house. *Id.* at 180; R.R. Vol. 5, p. 42. She even accompanied Mr. Smith after "Big Mike" told Smith he needed to dispose of the items. R.R. Vol. 5, p. 29. Appellant and Smith were the only parties present at Mr. Stovall's house when the items – including the victim's phone and clothing – were

---

[6] As noted *supra*, there is no "factual sufficiency" review in criminal cases after *Brooks v. State*.

burned. *Id.* at 30, 35-36, 52-53. Smith testified that he burned it to "dispose of evidence." *Id.* at 36, 52-53. Although Appellant emphasizes her own testimony – and that of Smith – claiming that Smith alone planned to destroy the evidence, the jury is free to accept or reject testimony, in whole or in part. *Margraves*, 34 S.W.3d at 919. The jurors could accept Smith's testimony as to his purpose in travelling to Stovall's house – destroying the evidence – while rejecting Smith's and Appellant's implausible assertions that she was completely ignorant of their purpose. *See id.* By Appellant's own admission, she "didn't want to get in trouble." R.R. Vol. 6, pp. 125-26.

In failing to contest her conviction for Aggravated Kidnapping, Appellant essentially concedes the fact that she knew an offense had been committed. *See generally* Brief for Appellant. In light of the totality of Appellant's actions and her clearly expressed interest in avoiding the consequences – and testimony that she helped remove the victim's items from the room, even travelling alone with Smith after "Big Mike" told him to destroy the evidence – the jury could reasonably infer that Appellant intended to aid or encourage her coconspirator's destruction of the evidence. As with Appellant's other points of error, because it cannot be said that *no* rational fact finder would have found Appellant guilty when viewing the evidence in the light most favorable to the prosecution, Appellant's third and final point of error should be overruled. *See Jackson*, 443 U.S. at 318-19.

## PRAYER

For the foregoing reasons, the State respectfully prays that Appellant's three points of error be overruled and that the judgment be affirmed in all respects.

Respectfully submitted,

/s/ Chari L. Kelly
**Chari L. Kelly**
Texas Bar. No. 24057939
Assistant Criminal District Attorney
Comal County
150 N. Seguin, Suite 307
New Braunfels, TX 78130
kellyc@co.comal.tx.us
(830) 221-1300
(830) 608-2008 (facsimile)
*Attorney for the State*

Joshua D. Presley
Texas Bar. No. 24088254
Assistant Criminal District Attorney
Comal County
150 N. Seguin, Suite 307
New Braunfels, TX 78130
preslj@co.comal.tx.us
(830) 221-1300
(830) 608-2008 (facsimile)

## CERTIFICATE OF SERVICE

I, Chari L. Kelly, do hereby certify that a true and correct copy of this Brief for the State has been delivered to Appellant KAYLA LARDIERI'S attorney of record in this matter:

Paul A. Finley
401 Main Plaza, Suite 200
New Braunfels, Texas 78130
pfinley@reaganburrus.com

By electronically sending it to the above-listed email address through efile.txcourts.gov e-filing, this 26th of October, 2015.

/s/ Chari L. Kelly
**Chari L. Kelly**

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are **6,707** words or less within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text and Times New Roman 12 for footnotes.

/s/ Chari L. Kelly
**Chari L. Kelly**